Filed 8/1/13; pub. order 9/3/13 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| KIMBERLY MARTIN-BRAGG, | B238772 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC459449) |
| v. | |
| IVAN RENE MOORE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Richard L. Fruin, Jr., Judge. Reversed.

Ivan Rene Moore, in pro. per., for Defendant and Appellant.

Thomasina M. Reed for Plaintiff and Respondent.

_____

Ivan Rene Moore appeals in pro. per. from the superior court's judgment following trial on the unlawful detainer complaint of Kimberly Martin-Bragg seeking forfeiture of a lease and possession of a property. The judgment, entered January 23, 2012, awarded Martin-Bragg possession of the disputed property, along with rent of $50,068.34 and rental damages of $57,220.96 for the period from May 1, 2011 to December 31, 2011, plus daily damages of $238.42 per day from January 1, 2012 until the date of judgment.

Moore appeals from the judgment on a number of grounds, most notably the trial court's refusal to consolidate the unlawful detainer case against him with another action then pending in the superior court, brought by Moore, seeking quiet title to the property based on allegations that Martin-Bragg's title to the property was actually held in trust for Moore's benefit. Upon a fragmentary and disorganized record we conclude that the trial court abused its discretion in refusing Moore's request to consolidate the unlawful detainer and quiet title actions for trial, and that Moore was prejudiced by being forced to litigate the complex issue of title to the property under the summary procedures that govern actions for unlawful detainer.

## BACKGROUND

**Martin-Bragg's unlawful detainer action**

On April 13, 2011, Kimberly Martin-Bragg filed an unlimited unlawful detainer action against Ivan Rene Moore. (See Code Civ. Proc., §§ 86, subd. (a)(4); 1161.) The complaint alleged Martin-Bragg's ownership of a residential property at 6150 Shenandoah Avenue in the Ladera Heights area of Los Angeles, Moore's month-to-month tenancy of the house under a written rental agreement, Moore's non-payment of the $7,152.62 monthly rent, his receipt of service of a three-day notice to pay rent or quit, and Martin-Bragg's demand for past-due rent of $50,068.34.[1]

---

[1] The complaint did not attach a copy of the written rental agreement on which Martin-Bragg's claim rested. (Code Civ. Proc., § 1166, subd. (d)(1) [requiring complaint to attach copy of written lease].)

2

After an unsuccessful demurrer, Moore answered in pro. per. on June 20, 2011, challenging Martin-Bragg's ownership of the property and right to receive rent for it.  His answer alleged that he and Martin-Bragg had been long-time domestic partners; that the property at 6150 Shenandoah Avenue is rightfully owned by Moore, a few corporations he uses in his music business, and Ronald Hills, the corporations' secretary; that the property had been in his family long before his relationship with Martin-Bragg; that title to the property had been held by Mr. Hills, and the property had been used by Moore over the years as collateral for business loans of over $5 million; and that in 2004 Mr. Hills had transferred title to Martin-Bragg in trust as a business arrangement for the benefit of Moore and his corporations, not for Martin-Bragg's personal use or benefit. He alleged that he and his corporations had made all payments for the property's purchase, maintenance, upkeep, and extensive improvements, and that Martin-Bragg had made no payments, or had been reimbursed for any payments she had made.  He also alleged that Martin-Bragg had received large amounts of cash, for which she refused to account, from a nightclub and radio stations owned and operated in other cities by Moore and the corporations.[2]

**Moore's action to quiet title**

On June 22, 2011, Moore filed a verified complaint against Martin-Bragg and others (L.A.S.C. No. BC464111), seeking quiet title to the 6150 Shenandoah Avenue property along with other causes of action.[3]  The allegations with respect to the quiet title

---

[2] The corporations were later identified as Rufftown Entertainment, Radio Multimedia, Rene Moore Music (a California corporation), and Rene Moore Music (a Nevada corporation).  Throughout this opinion we refer to the corporations used in Moore's music business collectively without differentiation, as did the witnesses at trial.

[3] The complaint in case number BC464111 alleged causes of action for breach of contract, fraud and intentional deceit, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, intentional interference with prospective economic advantage, conspiracy, accounting, slander of title, quiet title, and slander.  Martin-Bragg represented to the court that the other named defendants were her mother, her daughter, and a friend. Moore included these defendants because he believed that Martin-Bragg might have transferred the property's title to them.

claim were consistent with his answer to the unlawful detainer complaint.  The complaint alleged also that Martin-Bragg had provided him with special powers of attorney assuring that she would not interfere with right to the property; that in reliance on his relationship with Martin-Bragg he had caused title to the property to be transferred to her, with the understanding that she would hold it in trust for him; and that he had since made improvements of over $150,000 to the property.

**Denial of motion to relate and consolidate pending cases**

On June 23, 2011, Moore filed ex parte applications in the unlawful detainer proceeding to shorten time to file a notice of related cases, and a motion to consolidate the unlawful detainer proceeding with case number BC464111.  The trial court in the unlawful detainer case denied the unopposed application on June 27, 2011.

The unlawful detainer trial commenced on June 30, 2011.

Following the opening statement on Martin-Bragg's behalf, Moore renewed his earlier request to relate the unlawful detainer proceeding with case number BC464111, the quiet title action, citing *Asuncion v. Superior Court* (1980) 108 Cal.App.3d 141, and expressing concern that "once this court makes a ruling" in the unlawful detainer proceeding, "it could affect the res judicata."[4]  The trial court then acknowledged its right to relate the cases and to consolidate them in the unlawful detainer court.  "Now, if the two are related and consolidated, I can set the matter for trial probably in August or maybe July.  In that event, you'll get a judgment in both cases."  "What concerns me here," the court pointed out, "is that there is a challenge to the plaintiff's ownership.  I understand that she has a grant deed, but if there were loans subsequent to the grant deed

---

[4] Moore also sought judicial notice of another action (referred to as the "Bobby Watson case") in which he, as well as Martin-Bragg and others, had been defendants.  He claimed that in that case he had been forced to pay $280,000 to settle a judgment based on his ownership of the 6150 Shenandoah Avenue property.

with the property used as security, it might be evidence that her title was not the legal title but was held as a trustee."[5]

On the trial's first day the court heard testimony on the plaintiffs' behalf from Martin-Bragg, from Mr. Rile, an expert document examiner, and from Moore, under Evidence Code section 776. After the plaintiff rested her case, Moore presented testimony from Mr. Hills, Vijay Chandran, and Martin-Bragg (under Evidence Code section 776).

**The trial testimony on behalf of Martin-Bragg**

Martin-Bragg, a Los Angeles police officer, testified that Moore had lived in the home at 6150 Shenandoah Avenue since about 2000, before she purchased the property. Martin-Bragg purchased the property for $687,000 in April 2004, from Ronald Hills, a colleague of Moore. She paid a down payment of about $16,000 from her credit union account. Sometime earlier she had purchased the house next door, at 6160 Shenandoah Avenue, and she had lived in both houses, "in between the two properties."

Moore and Martin-Bragg were living together in the 6150 Shenandoah Avenue home until September 15, 2010, when Martin-Bragg moved out. At that time Moore signed a rental agreement agreeing to pay monthly rental of $7,152.62 (consisting of the monthly mortgage payment plus a late fee, "just in case").

Martin-Bragg denied having agreed that the property could be encumbered as part of a trust for Moore's benefit, and no such trust document has been recorded on the property. Moore paid—or was supposed to pay—the mortgage and all expenses on the property, since he was using it for his business and recording equipment.

---

[5] The trial court orally denied that it had refused to accept a notice of related cases, and respondent's brief represents that the record does not show that an application to relate and consolidate the cases was filed. However, the court's minute order of June 27, 2011 refutes that representation, showing that the court considered and denied Moore's ex parte application for order shortening time "for notice of related cases and motion to consolidate cases BC459449 and BC464111." Moreover, Martin-Bragg later orally represented to the court in Department 85 that the trial court in Department 15 was "addressing all the issues that Mr. Moore had put in this motion to consolidate."

Martin-Bragg admitted that she had signed documentation for a $5 million loan from Wachovia Bank to Moore and herself, as well as Moore's corporations, which she said was intended to be used to pay her what Moore then owed her. The loan encumbered the 6150 Shenandoah Avenue property, in which she and Moore were then living, but not the next door property she owned at 6160 Shenandoah Avenue. Martin-Bragg said that she had signed a power of attorney authorizing a pledge of the 6150 Shenandoah Avenue property to Wachovia Bank, but providing also that Moore was given no equity in the property. Moore's corporations made the payments on the Wachovia Bank loan, and Martin-Bragg was not responsible to the bank for payments.

Mr. Rile, a document examiner, testified on Martin-Bragg's behalf that the signature on the lease agreement, Exhibit 3, appeared to be Moore's.

Called as an adverse witness, Moore testified that neither the purported signature on the lease agreement (Exh. 5), nor a number of the comparison signatures used by the document examiner, were his. He believed that some of the signatures Mr. Rile had used for comparison, on checks and other documents, had been done by others—including Martin-Bragg—without and sometimes with his authorization. Moore confirmed that a lien on the 6150 Shenandoah Avenue property secured a $5 million bank loan.

The court admitted into evidence the five exhibits proffered by Martin-Bragg: The grant deed for the 6150 Shenandoah Avenue property (Exh. 1), a buyer's closing statement (Exh. 2), the rental agreement for the property (Exh. 3), a notice to pay rent or quit (Exh. 4), and a forensic report (Exh. 5) including the grant deed of the 6150 Shenandoah Avenue property to Martin-Bragg.

The plaintiff then rested her case.

**Defendant Moore's case in chief**

Mr. Hills testified to his 37-year association with Moore in the music business, and his status as secretary of Moore's corporations since 1992. His services for the corporations had included writing songs, producing music, and handling the recording business at the 6150 Shenandoah Avenue house. Title to the 6150 Shenandoah Avenue property had been in his name since 1999 or 2000, when Moore's mother (now deceased)

had transferred it to him, without payment, in connection with promotional transactions in which they were then involved. Title was placed in his name because his own home was being used as collateral for the project's financing.

Mr. Hills testified also about the resolution of the Bobby Watson case (which was the subject of Moore's request for judicial notice in the trial court), in which he, Martin-Bragg, Moore, and others, had been sued to recover upon Moore's interest in the 6150 Shenandoah Avenue property upon a claim of fraudulent transfer. The thrust of that testimony was that the lawsuit had alleged that title to the 6150 Shenandoah Avenue property had been transferred to Martin-Bragg without consideration in order to frustrate Moore's creditors, and that Moore had been forced to pay a $280,000 settlement in order to clear the title.

Mr. Hills testified that he received no payment for his transfer of the property to Martin-Bragg in April 2004. Title to both of the Shenandoah Avenue properties had been placed in his name in trust for the benefit of Moore's music, and he had transferred them to Martin-Bragg with that same understanding. He would not have transferred them to her without that understanding. He testified that he did not receive and had never seen the $48,000 check that Martin-Bragg had produced, purporting to be the proceeds from Martin-Bragg's purchase of the 6150 Shenandoah Avenue property.

Mr. Hills identified an Affidavit and Declaration (Exh. 6) representing that Martin-Bragg holds the 6150 Shenandoah Avenue property in trust for Moore, and that Moore has the right to encumber the property, consistent with Moore's representations to the bank. Both Martin-Bragg and Moore had signed the Affidavit and Declaration in Mr. Hills' presence, apparently in March 2009.

Mr. Vijay Chandran, a banker and financial adviser, testified that he had been the banker at Wachovia Securities and Wachovia Wealth Management who had structured the $5 million loan to Moore and his corporations. He testified that Martin-Bragg is "not responsible for any of that loan."

7

According to Mr. Chandran, the $5 million credit facility had originally been provided in about 2003, and had been modified and amended a number of times over the years, most recently between 2008 and 2009 as Moore's business interests changed. In connection with the loan the bank had required both Mr. Hills and Martin-Bragg to execute documentation to convey to the bank their security interests in the 6150 Shenandoah property, or to obtain Moore's guaranty of those interests. He understood from his conversations with Martin-Bragg at the time that she claimed no interest in the 6150 Shenandoah Avenue property, but she wanted her other assets segregated to protect them from anything having to do with the loan. Wachovia Bank (now Wells Fargo Bank) still holds security interests in the property.

The 6150 Shenandoah Avenue property had also been subject to a lis pendens in favor of a judgment creditor, which the bank had required Moore to clear before it extended the loan. The documentation regarding the property's ownership had been reviewed and handled by others at the bank, not by Mr. Chandran.

Martin-Bragg testified under Evidence Code section 776 that she had ended her domestic partner relationship with Moore when she had asked him to repay funds she had loaned to him and his corporations. "We had an agreement. You [Moore] were going to pay. I mortgaged my property in order to loan the corporation the money. You were going to be responsible for paying that note." "You and the corporations signed the I.O.U.s." "$2 million I've loaned this man to get this business going. I signed for these loans because he was supposed to pay me my money. When the money came from the loans, no money, nothing."[6] Martin-Bragg conceded that the replacement promissory note dated October 18, 2009 (Exh. 7) (purportedly the amended $5 million loan document) does not indicate her responsibility for the loan, nor do Exhibits 11, 12, or 13 identify her in any capacity; but said she has other loan documents that do.

---

[6] The court accepted Exhibits 11 and 13 from Moore, identified as a loan application and guaranty, and a certificate of resolution to borrow. It accepted from Martin-Bragg Exhibit 12, purporting to be a ratification of guaranty and pledge agreement.

When Martin-Bragg's testimony deteriorated into a volley of accusations between the parties, the trial court concluded that "I'm sort of through with this." "We're not going to finish this case today."

The court then addressed the state of the evidence. "The issue is whether or not Ms. Bragg owns 6150 Shenandoah," and there is evidence on both sides. "The rental agreement certainly is signed by Moore" (as Ms. Moore and Mr. Rile had testified), and "[t]he grant deed supports her title." However, some further documents are needed, "given the relationship between the parties and the fact that the seller of the property claims he got no money" from the sale. The court asked Martin-Bragg to produce escrow instructions that say to whom money was paid, and loan documents showing that she had borrowed to pay off any mortgage and to pay additional money to the seller. "Now, if, in fact, the only money that Ms. Bragg put into the house was the $16,000 that she borrowed from the L.A.P.D. credit union, then I wonder what's going on."

Expanding on the evidence, the court explained: "It seems to me what's really going on here is a very involved commercial relationship between the two, and she's trying to save whatever assets are in her name so that she can sell those assets or rent those assets in order to get paid back some of the money that she's loaned to Moore and his companies." The court went on: "I'd also like to have a title report. This is not a standard unlawful detainer action. And I don't think I should oust Moore of possession given that he has extensive recording equipment and has paid for remodeling without the clearest or at least sufficient evidence that the property belongs to Ms. Bragg." After again noting that the evidence of title "cuts both ways," the court concluded "This is a mess, and unless it's clear, I probably shouldn't give a U.D. [judgment]. Probably what I should do is relate the other case to me and try both cases together in August." "In other words, I can bring the other case here and we can have a really early trial."

Although Moore may be "trying to create a lot of problems" by naming other parties in his quiet title action, "this property lends itself to raising those problems because . . . . it's been used as a piggy bank to obtain money for the operation of the corporations, and Ms. Bragg has been part and parcel of that procedure."

9

Counsel for Martin-Bragg questioned whether the court could consider whether Martin-Bragg held title to the property in trust: "Well, is that really proper in an unlawful detainer? . . . because in an unlawful detainer you're not supposed to examine title issues beyond the deed, as far as I'm concerned." The court acknowledged the quandary: "Well, maybe we ought to terminate this right now, because you're correct, title is not an issue in [an] ordinary unlawful detainer. But if there's a suspicion that the power of the court is being used to oust someone from possession when there is a contest about title, usually the judge will not act to give the U.D. judgment."[7]

**Moore's renewed request for consolidation of the pending cases**

Following the court's suggestion that it could relate the pending cases for unlawful detainer and quiet title and try both cases together in the next month, Moore renewed his request for consolidation: "I do agree with the court that you should merge the two cases because it is an issue of title. With the res judicata involved in this case and the other issues that are apparent, it needs to be adjudicated with both of the cases." But the court did not consolidate the pending cases, noting that the quiet title action involved other defendants and other claims as well.

The court set two hours on Monday morning, July 11, 2011, for completion of the unlawful detainer trial. The consolidation issue remained unresolved.

**The TRO barring the unlawful detainer trial's continuation, and Martin-Bragg's ex parte motion to set aside the TRO**

On July 11, 2011, the trial court in Department 15 (where the unlawful detainer trial was pending), was met with a ruling from Department 85 of the Superior Court granting Moore an ex parte temporary restraining order against the unlawful detainer trial's continuation (apparently in light of the pending quiet title issue in case number

---

[7] The trial court explained: "There's two relationships going on here. One is that they were in a domestic partnership; the second is they were in essence partners in the business. She was loaning money to him in the expectation that she would get that money back. Now it turns out that maybe she won't. But that's an explanation as to why she subordinated her title to the $5 million loan."

10

BC464111).  Judge Fruin in Department 15 therefore suspended the unlawful detainer trial, and adjourned until August 1, 2011, "due to the ruling before Hon. Chalfant."  It ordered the parties to report that result to Department 85.[8]

At the July 13, 2011 TRO hearing in Department 85, Martin-Bragg explained that the unlawful detainer trial in Department 15 remained uncompleted because "the judge did decide to take up the issues that Mr. Moore had raised in regards to ownership."  She represented that the unlawful detainer trial was "addressing all the issues that Mr. Moore had put in this motion to consolidate.  All the issues are being addressed by Judge Fruin."  The trial court responded:  "I don't know that he can do that in an unlawful detainer case."  After hearing Moore's objections to trial of the issue of title in the unconsolidated summary unlawful detainer proceeding, the court recessed the proceedings in order to call Judge Fruin.[9]

After reconvening in Department 85, Judge Chalfant explained that Judge Fruin told him that the plaintiff had not yet rested in the unlawful detainer trial (although the record shows otherwise).  According to Judge Chalfant, "[Judge Fruin] believes that the scope of his proceeding, what he was trying to determine anyway was both legal and beneficial ownership of the property."  Judge Fruin said "that's both probably what he should do and he is going to do it, is that he is going to reconsider consolidation and consolidate the two cases.  And he wants me to dissolve the TRO."

With that, the court then granted Martin-Bragg's request to dissolve the TRO.  The court suggested that the parties "walk downstairs" to talk to Judge Fruin about "what

---

[8] The July 13, 2011 transcript for Department 85's proceedings in case number BC464111 shows that before issuing the TRO, the court, Judge James C. Chalfant, had directed Moore to first "exhaust the remedy of asking the trial court in [the unlawful detainer] case to relate the unlawful detainer case and then consolidate the two."  The Department 85 court had then granted the TRO, setting a July 21 return date.

[9] Moore explained to Judge Chalfant that "[t]the issue of ownership cannot be decided in an unlawful detainer case.  It can't.  That's not the proper place.  When I asked [Judge Fruin] to combine it, so all those issues can be decided at one time, he then denied."

11

should be done, but I'm telling you he has said he's going to consolidate the two cases, essentially reconsider your motion."[10]

In Department 15, Judge Fruin and the parties discussed the "proposal" that the court relate and consolidate the cases for trial. However, when Moore suggested that some discovery would be required (which he thought could be done "quickly and expeditiously"), the court interrupted with "another proposal," that "I complete the U.D. trial and stay the judgment on the U.D. trial until we do the second trial." But the court denied Moore's request for either consolidation or expedited discovery, saying "I don't plan to delay this case for so-called discovery," because "[a] U.D. action is entitled to priority,"[11] and Martin-Bragg should provide him with documents in her possession upon request.

The court tentatively set resumption of the unlawful detainer trial for about a week hence, on July 21, 2011, ordering counsel for Martin-Bragg to provide the court and Moore with two days' advance confirmation of that date; and trial would otherwise resume on August 1, 2011 (the date that had been set on July 11, 2011). However, on July 21, a number of circumstances (another proceeding involving both parties), then a bankruptcy automatic stay relating to one of the corporations), resulted in additional continuances, ultimately to December 16, 28 and 29, 2011.

---

[10] The court went on to explain that Judge Fruin had said his concern about consolidation was that Moore would then be entitled to discovery, which would delay the unlawful detainer trial. "I don't know what he's going to do," Judge Chalfant explained. "He may sever the title portion of the two cases, that is the UD and the title portion of Moore's case; try that issue first while you take discovery on your other causes of action. . . . [B]ut I do know that the scope of what he wants to do includes who owns the property legally and beneficially. And because of that, there's no reason for a TRO.

[11] Ordinarily, in an unlimited action "[o]ne department of the superior court cannot enjoin, restrain, or otherwise interfere with the judicial act of another department of the superior court." (*Ford v. Superior Court* (1986) 188 Cal.App.3d 737, 742.) Because neither the trial court nor any party raised this issue, however, we do not address it further.

At one of the scheduling hearings during that period, on December 13, 2011, the court reasserted that "I'm going to determine title in this action. I'm not going to relate the two cases here or consolidate them." The unlawful detainer trial must proceed, the court explained, because it has priority and because the property is threatened with foreclosure for nonpayment of the mortgage.

On December 15, 2011, Moore filed an ex parte application for a continuance of the trial until December 22, 2011, on the ground that he would be unavailable on December 16, 2011, and identifying 16 witnesses who would be unavailable until after January 2, 2012.[12] The application apparently was denied.

**Trial resumes**

Trial resumed on Friday, December 16, 2011, with Moore present "via Court Call." Although the court's minutes reflect no ruling, the court apparently permitted Martin-Bragg to reopen her case-in-chief for additional testimony from Mr. Rile, the document examiner, and the identification of two reports prepared during the trial recess, dated October 28, 2011 (Exh. 15), and November 3, 2011 (Exh. 16).[13] The record on appeal includes no transcript of the December 16 proceedings, nor of the continued trial proceedings on December 28, 2011.[14]

---

[12] Earlier in the trial proceedings Moore had explained to the court that his business obligations compelled him to travel each Thursday in order to be in Lexington, Kentucky each Friday through Sunday, where his nightclub could not open without his presence because its liquor license was in his name.

[13] According to the court's later statement of decision, Mr. Rile testified that the signature block of the Affidavit and Declaration, purporting to contain Martin-Bragg's and Moore's signatures, was created by photocopying and resizing the parties' signatures taken from a Notice of Appeal filed in another case.

[14] Moore's initial designation of record in his appeal identified proceedings on December 16 and 28, 2011, as dates for which reporters' transcripts were requested; but Moore later filed a redesignation of record (after obtaining this court's permission to do so on specified conditions), which omitted a number of dates to be reported, including December 16 and 28.

On December 29, 2011, the trial proceedings began with Moore's motions to dismiss (which the court denied after hearing argument), and for the court to recuse itself for bias and prejudice (which the court denied without hearing argument).

After initially refusing to permit Moore to present further testimony from Mr. Hills and other potential witnesses, the court permitted Mr. Hills to testify that the crux of the Bobby Watson case (in which he and Martin-Bragg were defendants along with Moore and others) was the claim of the judgment-creditor plaintiff that Moore was in fact the owner of the 6150 Shenandoah Avenue property; and the case had been settled because Moore indeed was the rightful owner of the property. Mr. Hills testified that the 6150 Shenandoah Avenue property had been used as collateral for loans to the corporations Moore used in his recording business, and had been used as an asset of the corporations and of Moore, including as collateral for the $5 million Wachovia Bank loan. Martin-Bragg had never had any ownership interest in the corporations, and had never claimed any such interest.[15]

Mr. Hills testified that he had not received escrow closing documents for the sale of the property to Martin-Bragg, nor the $48,000 payment for the property, and he had never signed any escrow documents for that transaction.

Moore, called on his own behalf, testified about the formation, use, and ownership of the corporations and about a number of properties—including the 6150 Shenandoah Avenue property—owned and operated by and for his music business enterprises. He testified that Martin-Bragg had signed documents permitting encumbrances to be placed on the 6150 Shenandoah Avenue property to secure the Wachovia Bank loan, and she had willingly renewed the loan documentation in order to permit the 6150 Shenandoah Avenue property to be used as security, as long as no other properties in which she held title were involved.

---

[15] Mr. Hills also testified that he had filed a lawsuit (apparently case number BC4675551, filed December 20, 2011), to rescind his sale of the 6150 Shenandoah Avenue property to Martin-Bragg.

14

Moore testified that after the court in the Bobby Watson case had announced its ruling that Moore owned the property, Moore paid a substantial settlement in the fraudulent-transfer claim, at the Wachovia Bank's insistence. Martin-Bragg again signed for increases of the encumbrance on the 6150 Shenandoah Avenue property when Moore paid another $250,000 for an FM translator in order to simulcast his FM radio broadcast to another radio station, and when he purchased a Louisville, Kentucky radio station for $1.4 million. Using the 80-channel recording console and related equipment at the 6150 Shenandoah Avenue house, Moore, his corporations, and others, used the 6150 Shenandoah Avenue house to make and edit sophisticated audio and video recordings, as well as to edit movie soundtracks and commercials for his radio stations.

Moore testified that he had never been Martin-Bragg's tenant, and that she had never asked him to pay rent.

He testified on many other subjects concerning transactions with Martin-Bragg, including her claim that he owed her $2.3 million; his belief that she had pilfered about $80,000 in Louisville, Kentucky nightclub cash receipts; and the invalidity of corporate documents showing Martin-Bragg as corporate president of Rene Moore Music, authorizing a loan and loan payments to her, and showing her ownership of one of the corporations. A recent appraisal of the 6150 Shenandoah Avenue property (Exh. 101) showed its value to be $880,000, and Moore believed the property to be worth even more. He offered other documents, including a deed of trust purporting to show Mr. Hills' interest in the property in 2008.

Moore testified that in 2000 he had signed and had notarized an affidavit of registered domestic partners, which Martin-Bragg said she would register with the state to make them registered domestic partners. In their relationship it was Martin-Bragg who maintained the documents. Moore has seen her copy and paste to modify documents many times.

Moore was present and witnessed Martin-Bragg sign the Affidavit and Declaration between Moore and Martin-Bragg, which was given to the bank to show that the property was held by her in trust. Moore was unable to locate the original of the

Affidavit and Declaration showing that Martin-Bragg held title to the property in trust for him.

There were never liens on the property for Martin-Bragg's benefit. All the liens were consistent with the development of the business. Mr. Hills was involved to protect his investment, because he had put money into the business, without promissory notes, based on trust and oral agreements.

On cross examination Moore admitted that in the Bobby Watson case he had signed a declaration under penalty of perjury saying that he does not own the 6150 Shenandoah property, and has not owned any property since 1988 or 1989. By that he meant that he owned no property in his name, although he did own interests in some properties in the name of the corporations or Mr. Hills. He testified that he did not sign the Addendum to Domestic Partnership Agreement (Exh. 37), which purports to relinquish rights to the 6150 Shenandoah Avenue property), and the signature on it does not appear to be his.

Moore denied manipulating signatures in order to create the signature page on Exhibit 6, the Affidavit and Declaration, and denied that in 2006 the court in another case had found that he had forged his deceased mother's name on a deed to real property, or that he had forged his former attorney's name.

Following some further testimony from Martin-Bragg on these subjects, and after Moore renewed his claim of prejudice due to his inability to obtain discovery, the trial court received a number of documents in evidence, and ended the trial without final arguments.[16]

---

[16] Moore objected to the admission into evidence of the copy of the face of a $48,000 escrow check to Mr. Hills (for lack of authentication and lack of any showing it was received by Mr. Hills), and to the admission of the unsigned escrow documents, received from Martin-Bragg rather than the escrow company and not shown to have been maintained in the ordinary course of business. The court did not address the objection to the escrow documents, but explained that it was receiving the $48,000 check in evidence "as part of the package that Martin-Bragg testified was received in the mail," not for the fact that Mr. Hills had received the money.

16

**Entry of judgment and statement of decision**

The trial court entered judgment in Martin-Bragg's favor on January 23, 2012, giving possession of the property at 6150 Shenandoah Avenue to Martin-Bragg and granting her damages against Moore totaling $112,772.96, plus costs and attorney fees. In a six and one-half page statement of decision the court found that Moore occupied the house at 6150 Shenandoah Avenue under a written agreement to pay rent to Martin-Bragg; that he had never paid rent; that he was served with a statutory three-day notice to pay rent or quit; and that he failed to pay the required rent.

The statement of decision expresses the court's acceptance of Martin-Bragg's version of the events, and rejection of Moore's testimony, on credibility grounds. It recounts findings that Moore and Martin-Bragg had been unregistered domestic partners from May 2002 until January 1, 2011; that Moore, and a number of corporations he controls, own interests in radio stations in other states; that Moore lived in and operated his music business at the 6150 Shenandoah Avenue property; and that Martin-Bragg, a Los Angeles police officer and licensed real estate agent, lived next door at 6160 Shenandoah Avenue.

Martin-Bragg purchased the 6150 Shenandoah Avenue property in April 2004, from Mr. Hills, a colleague of Moore in his music business. Six years later, in September 2010, Moore signed a rental agreement for the property, specifying monthly rent of $7,152.62. Moore continued living in and using the premises for his business; he and his corporations continued to make the mortgage and tax payments for the property (sometimes with checks drawn by Martin-Bragg, who was a signatory on the corporations' accounts); and he (or his corporations) obtained bank loans using the property as collateral, with Martin-Bragg's consent and with her signatures. He paid no rent to Martin-Bragg.

The statement of decision addressed the central defense pleaded by Moore: that Martin-Bragg holds title to the property in trust for Moore, his corporations, and Mr. Hills; and that Martin-Bragg has no beneficial interest in the property. With respect to that defense, the court itemized its findings that the grant deed transferring the property to

17

Martin-Bragg was signed by Mr. Hills; Martin-Bragg's evidence established that she had in fact obtained loans from a credit union and a third-party lender in order to complete the purchase; and that copies of the escrow documents that Martin-Bragg said the escrow company had sent to her and to Mr. Hills (although unsigned and unauthenticated by an escrow officer), establish that the property's purchase by Martin-Bragg was conducted through a third-party escrow.[17]

The trial court found also that the May 6, 2006, "Affidavit and Declaration" was a fabrication,[18] and that in an earlier declaration filed in another action, Moore had denied under oath that he had any ownership interest in the 6150 Shenandoah Avenue property. The court concluded that "Defendant's 2006 declaration, therefore, defeats any assertion the defendant now makes that he always has held an undocumented interest in the 6150 Shenandoah property."

The trial court concluded that Moore's nonpayment of rent after the September 2010 rental agreement entitled Martin-Bragg to possession of the property. The judgment grants "restitution and possession of the premises" to Martin-Bragg, and rent

[17] Moore objected to the statement of decision's failure to address Mr. Hills' testimony that he had held title to the property in trust only, and that the transfer to Martin-Bragg was done in trust only. He also objected to the decision's determination of Mr. Hills' ownership interest without regard to the fact that an action asserting that interest was then pending in the superior court between Mr. Hills and Martin-Bragg (LASC No. BC475551).

[18] The document entitled Affidavit and Declaration (Exh. 6) purports to detail the parties' agreement that Martin-Bragg would hold title to the 6150 Shenandoah property (and another property in Redondo Beach) in trust for Moore and his corporations; that she would have no beneficial rights in the properties; and that Moore could continue to hypothecate or transfer the properties in the normal course of business. Martin-Bragg denied signing any such document. Moore contended that the document had been prepared and submitted to Wachovia Bank in order to fund his $5 million line of credit, and was signed by Martin-Bragg. According to the court's statement of decision, Mr. Rile, the document examiner, testified (apparently during a session for which no transcript was designated in the record on appeal) that Moore's and Martin-Bragg's signatures were placed on the document by photocopying and resizing the signatures from a Notice of Appeal filed in 2006 in another case.

from January 1, 2012 to the date of judgment. Although the judgment does not explicitly grant "title" to Martin-Bragg, the trial court explicitly tried the issue of title in its determination that Martin-Bragg was entitled to possession; and its statement of decision explicitly rejects Moore's claim that he or his corporations are the property's true owners.

Moore's timely appeal does not challenge the sufficiency of the evidence to support the trial court's findings, but lists nine claims of error that he contends require reversal of the judgment and remand for a new trial.[19] We find merit in one of his contentions, and therefore reverse the judgment and remand for retrial without consideration of his remaining claims.

## DISCUSSION

### Trial Of The Issue Of Title To The Property In The Summary Unlawful Detainer Proceeding Abused The Trial Court's Discretion

Moore contends that the trial court's refusal to consolidate the unlawful detainer proceeding with his pending action for title to the subject property resulted in improper and prejudicial determination of "complex and complicated property ownership issues and rights in an unlawful detainer action." The record confirms that he was prejudiced by the procedure adopted by the trial court.

In unlawful detainer proceedings, ordinarily the only triable issue is the right to possession of the disputed premises, along with incidental damages resulting from the unlawful detention. (*Larson v. City and County of San Francisco* (2011) 192 Cal.App.4th 1263, 1297; Friedman et al., Cal. Prac. Guide: Landlord-Tenant (The Rutter Group 2012) ¶ 8:4, p. 8-1). Ordinarily, issues respecting the title to the property cannot be adjudicated in an unlawful detainer action. (*Drybread v. Chipain Chiropractic Corp.* (2007) 151 Cal.App.4th 1063, 1072; Friedman, *supra*, ¶ 7:267, p. 7-58.15.) The denial of

---

[19] Moore's request for modification of the court's tentative statement of decision asserts that the trial court had ex parte telephone communications with plaintiff's counsel before setting the trial's resumption for a date on which Moore and his witnesses would be unavailable. Lacking any record to support these claims, however, this court is unable to evaluate Moore's contentions.

19

certain procedural rights enjoyed by litigants in ordinary actions is deemed necessary in order to prevent frustration of the summary proceedings by the introduction of delays and extraneous issues. (*Markham v. Fralick* (1934) 2 Cal.2d 221, 227; *Vasey v. California Dance Co*. (1977) 70 Cal.App.3d 742, 747.)

However, the trial court has the power to consolidate an unlawful detainer proceeding with a simultaneously pending action in which title to the property is in issue. That is because a successful claim of title by the tenant would defeat the landlord's right to possession. (Friedman et al., Cal. Prac. Guide: Landlord-Tenant, *supra*, ¶¶ 8:5:1, 8:409.1, pp. 8-2, 8-142.) When an unlawful detainer proceeding and an unlimited action concerning title to the property are simultaneously pending, the trial court in which the unlimited action is pending may stay the unlawful detainer action until the issue of title is resolved in the unlimited action, or it may consolidate the actions. (*Id*., ¶ 7:268, p. 7-58.15.) If it does neither, and instead tries the issue of title under the summary procedures that constrain unlawful detainer proceedings, the parties' right to a full trial of the issue of title may be unfairly expedited and limited. If complex issues of title are tried in the unlawful detainer proceeding, the proceeding loses its summary character; defects in the plaintiff's title "are neither properly raised in this summary proceeding for possession, nor are they concluded by the judgment." (*Cheney v. Trauzettel* (1937) 9 Cal.2d 158, 160; *Wood v. Herson* (1974) 39 Cal.App.3d 737, 745; *Gonzales v. Gem Properties, Inc*. (1974) 37 Cal.App.3d 1029, 1033-1035.)

The trial court in this case recognized that Moore's action for title in case number BC464111 raised the issue whether title to the property was held by Martin-Bragg as a security interest or in trust for the benefit of Moore's music business. The parties' trial testimony tended to confirm the court's initial concern about the complexity of the issue of title. Martin-Bragg claimed title by purchase of the property from Mr. Hills in 2004, for consideration. But Mr. Hills testified that he had held title to the property that he had received from Moore's (now deceased) mother, without payment. He denied having received any payment for his transfer of the property to Martin-Bragg, and testified that his title—and Martin-Bragg's—was held in trust for Moore and his business entities.

20

Moreover, Martin-Bragg produced no signed escrow documents confirming her payment of consideration for the purchase, and she could show no proof that Mr. Hills had received the $48,000 or any other proceeds from the escrow. Martin-Bragg had made no payments on the property's encumbrances, nor for its maintenance or improvement (all of which had been paid by Moore and his companies). Moore's banker testified that the property was encumbered as security for a $5 million credit facility in Moore's favor.

As the court recognized, at that point the evidence respecting title to the property "cuts both ways," suggesting "a very involved commercial relationship between the two, and she's trying to save whatever assets are in her name so that she can sell those assets or rent those assets in order to get paid back some of the money that she's loaned to Moore and his companies." "There's a lot more than meets the eye in this case," and "before I would issue a U.D. judgment, . . . I want to be pretty clear that this property belongs to her as a grant deed and not simply as security for all the money that she's loaned to him and his corporations." The property had "been used as a piggy bank," raising the question "[i]s this a true landlord-tenant relationship or is this in actuality a business operation which has been mortgaged to provide loans to Moore's business?"

As such, the court recognized that title issue was complex and not subject to summary trial proceedings. "This is a case with a lot of issues in it. It's not a standard U.D. . . . ." If Moore's action for title were meritorious, it would defeat Martin-Bragg's right to possession. In other words, Martin-Bragg's right to possession could not be determined without first determining the issue raised by the quiet title claim. "Probably what I should do is relate the other case to me and try both cases together in August," early trial, the court suggested. And when counsel for Martin-Bragg questioned whether the court could consider the issue of title at all, the court confirmed that "maybe we ought to terminate this right now, because you're correct, title is not an issue in an ordinary unlawful detainer. But if there's a suspicion that the power of the court is being used to

21

oust someone from possession when there is a contest about title, usually the judge will not act to give the U.D. judgment."[20]

However, the trial court also recognized that consolidation of the unlawful detainer proceeding with Moore's quiet title action could change the nature of the action. The unlawful detainer law's provisions for summary determination of the right to possession would be lost if the lawsuit were to be transformed into an ordinary action at law involving complex issues of title to the property. "[A]n action for unlawful detainer can co-exist with other causes of action in the same complaint," it has been held, but only "so long as the entire case is treated as an ordinary civil action, not as a summary proceeding." (*Lynch & Freytag v. Cooper* (1990) 218 Cal.App.3d 603, 608.)

Instead of treating the unlawful detainer as an ordinary civil action rather than as a summary proceeding, however, the trial court did the opposite. It instead insisted upon a summary trial of the parties' dispute as to title, without the discovery and preparation that the law affords for ordinary civil actions.

"The California wrongful detainer statutes were '. . . enacted to provide an adequate, expeditious and summary procedure for regaining possession of real property wrongfully withheld by a tenant. [Fn. omitted.] The rights and remedies afforded a landlord by the statutory provisions are given in lieu of his common law rights and remedies which included the right to enter and expel the tenant by force. [Citations.] The enactment of such statutory procedures is supported by the strong public policy of preserving the peace [citation] as well as the recognition of the unique factual and legal characteristics of the landlord-tenant relationship. [Citation.] . . . .'" (*Deal v. Municipal Court* (1984) 157 Cal.App.3d 991, 995, quoting *Childs v. Eltinge* (1973) 29 Cal.App.3d 843, 853.)

These reasons form the constitutional justifications for the summary nature of unlawful detainer actions, and the limitations on the issues that may be raised by a

---

[20] The trial court explained: "It may be that Moore is correct, that . . . property's held in trust for him. [Ms. Bragg] needs to prove that she paid money for this property."

22

defendant in such proceedings. (*Lindsey v. Normet* (1972) 405 U.S. 56, 92 S.Ct. 862.) In that case the United States Supreme Court held that the summary procedures of an Oregon forcible entry and wrongful detainer statute were justified by the nature of the landlord-tenant relationship, and when applied in that narrow context they afford the tenant due process. "There are unique factual and legal characteristics of the landlord-tenant relationship that justify special statutory treatment inapplicable to other litigants. . . . [U]nless a judicially supervised mechanism is provided for what would otherwise be swift repossession by the landlord himself, the tenant would be able to deny the landlord the rights of income incident to ownership by refusing to pay rent and by preventing sale or rental to someone else. . . . Speedy adjudication is desirable to prevent subjecting the landlord to undeserved economic loss and the tenant to unmerited harassment and dispossession when his lease or rental agreement gives him the right to peaceful and undisturbed possession of the property. Holding over by the tenant beyond the term of his agreement or holding without payment of rent has proved a virulent source of friction and dispute," and a state is "well within its constitutional powers in providing for rapid and peaceful settlement of these disputes." (*Id.* at pp. 72-73.)

However, the Supreme Court did not approve the application of these justifications outside of the context of routine cases in which the tenant has failed to pay rent or has held over after the tenancy has expired, "and the issue in the ensuing litigation is simply whether he has paid or held over." (*Lindsey v. Normet*, *supra*, 405 U.S. at pp. 64-65.) "The constitutionality of these summary procedures is based on their limitation to the single issue of right to possession and incidental damages. (*Ibid.*; *Deal v. Municipal Court*, *supra*, 157 Cal.App.3d at pp. 995-996.) Although California now permits the adjudication of substantially more defenses in unlawful detainer proceedings than simply the payment of rent,[21] the rule in this state is that because trial courts are afforded express

---

[21] E.g., *Green v. Superior Court* (1974) 10 Cal.3d 616; *Knight v. Hallsthammar* (1981) 29 Cal.3d 46 [breach of implied warranty of habitability]; *Schweiger v. Superior Court* (1970) 3 Cal.3d 507; *Aweeka v. Bonds* (1971) 20 Cal.App.3d 278 [retaliatory eviction];

statutory discretion to extend the unlawful detainer law's expedited pleading timetable for good cause, the statute's truncated time to respond to an unlawful detainer complaint does not deprive the defendant of due process of law. (*Deal v. Municipal Court*, *supra*, 157 Cal.App.3d at pp. 997-998.)

The trial court in this case recognized that under these settled principles, Moore was entitled to interpose his claim of equitable ownership of the 6150 Shenandoah Avenue property as a defense to Martin-Bragg's claim of unlawful detainer. His quiet title claim related directly to the issue of possession; if he were to prevail on that claim, the result would be a judgment entitling him to retain possession of the premises. (See *Deal v. Municipal Court*, *supra*, 157 Cal.App.3d at p. 995.)

It does not follow, however, that by pleading his claim to title as a defense to unlawful detainer (while simultaneously asserting his claim to title in a separate action), Moore necessarily acceded to the summary and expedited procedures of unlawful detainer with respect to that issue, or waived his right to the statutory procedures that apply to trial of complex issues of title. His timely requests for consolidation of the unlawful detainer with the action for quiet title sought the opposite result, as the trial court recognized. The fact that Moore pleaded his title to the property as an affirmative defense to the unlawful detainer action did not constitute his consent to have his claim heard under the summary unlawful detainer procedures. (*Mehr v. Superior Court* (1983) 139 Cal.App.3d 1044, 1050.)

The trial court in this case initially declined to order consolidation of the unlawful detainer with the action for title expressly because that would delay the unlawful detainer proceeding for discovery, thereby compromising Martin-Bragg's right to the expedited summary procedures of the unlawful detainer law. "I don't plan to delay this [unlawful detainer] case for so-called discovery." However, the court also recognized that the key issue to be tried was title: "whether or not Ms. Bragg owns 6150 Shenandoah." And

---

*Abstract Investment Co. v. Hutchinson* (1962) 204 Cal.App.2d 242 [racial discrimination].

24

although the trial court advised Judge Chalfant in Department 85 that it would consolidate the unlawful detainer and quiet title cases, the court then declined to do so. As the court later explained, "I'm going to determine title in this [unlawful detainer] action. I'm not going to relate the two cases here or consolidate them. The title action does not have a priority. It provides for the usual discovery procedures. And I think that consolidating that action with this one would simply delay the trial."[22]

The trial court's concern about loss of the summary procedures to which unlawful detainer plaintiffs are entitled was justified; it undoubtedly had discretion to fashion conditions and limitations to protect and preserve those legislatively imposed benefits to the extent possible. However, that discretion did not permit it to wholly disregard Moore's legitimate need for, and right to, time to prepare and to obtain reasonable discovery in advance of trial of the admittedly complex issue raised by the parties' conflicting claims of ownership, or to require that those complex issues be tried within the summary procedures designed for straightforward unlawful detainer claims. (*Lynch & Freytag v. Cooper*, *supra*, 218 Cal.App.3d at p. 609 ["It would obviously be unfair to require the defendant-tenant to defend against ordinary civil actions under the constraints of the summary procedure in unlawful detainer actions"]; *Deal v. Municipal Court, supra*, 157 Cal.App.3d at p. 996; see *Lindsey v. Normet*, *supra*, 405 U.S. at pp. 64-66 [summary unlawful detainer procedures are constitutionally acceptable as long as they are applied to straightforward issues of possession and incidental damages].)

The reasoning applied in a number of other decisions is instructive, though not controlling in this circumstance. In *Asuncion v. Superior Court*, *supra*, 108 Cal.App.3d 141, for example, a lending company filed a municipal court unlawful detainer action based on title obtained through what it asserted was a foreclosure sale of the property.

---

[22] The court went on: "This trial has to proceed because, one, it's entitled to priority; two, because the property is subject to foreclosure because the mortgage is not being paid. I know there's no foreclosure sale that's scheduled at this point in time, but it's inevitable to be done; so title, or at least the U.D. action, should be determined as soon as possible."

The property's homeowners filed a superior court action alleging that the lender had obtained the deed through fraud. The appellate court held that the court in which the civil action for title was filed should "retain jurisdiction over the matter so long as substantive issues of ownership remain to be litigated." (*Id*. at p. 147.) That result was required— even though it had the effect of compromising the summary nature of the unlawful detainer action—because due process precluded the homeowners' eviction without having the opportunity to adjudicate the affirmative defenses of fraud, which, if proved, would demonstrate their right to ownership and possession. (*Ibid.*)

In *Mehr v. Superior Court*, *supra*, 139 Cal.App.3d 1044, after being sued for unlawful detainer the defendants filed an answer claiming that the plaintiff's trustee's deed had been obtained by fraud, and filed a separate action based on that claim. The appellate court held that because the defendants were entitled to litigate their right to title in the fraud action, the trial court was required to stay execution of its unlawful detainer judgment, upon reasonable conditions for the protection of both parties' interests, pending the appeal. (*Id.* at pp. 1047-1050.)

In *Berry v. Society of St. Pius X* (1999) 69 Cal.App.4th 354, the plaintiff sought unlawful detainer against a religious society and several priests who were in possession of disputed church properties. The plaintiff claimed a right to possession of the properties by virtue of his appointment as pastor of the religious entity that held title as a corporation sole. The court of appeal affirmed the trial court's treatment of the unlawful detainer action as an ordinary civil action for declaratory relief rather than applying the summary procedures that apply to unlawful detainer proceedings, and its entry of summary judgment for the defendants on the merits. Although "unlawful detainer is intended to afford an expeditious remedy for obtaining possession of premises wrongfully withheld," the court explained, "the summary remedy of an unlawful detainer action was not the proper vehicle" to litigate the complex issues of title in that matter. (*Id.* at p. 364, fn. 7.)

Each of these cases reflect the courts' recognition that when complex issues of title are involved, the parties' constitutional rights to due process in the litigation of those

issues cannot be subordinated to the summary procedures of unlawful detainer. (*Lindsey v. Normet*, *supra*, 405 U.S. at pp. 64-66 [summary unlawful detainer procedures are constitutionally acceptable when they are applied to straightforward issues of possession and incidental damages]. By failing to determine whether and how Moore's rights and needs might be balanced with Martin-Bragg's legitimate interests in the matter's prompt resolution, and instead proceeding to try the complex issue of the parties' rights to title of the property within the confines of the summary procedures that apply only to straightforward determination rights to possession, the court abused its discretion.[23]

Moore's rights are not foreclosed because he asserted his ownership of the property, "putting the issue before the court and actually litigating title matters fully as an affirmative defense" in the unlawful detainer action, contrary to Martin-Bragg's argument on appeal. (*Mehr v. Superior Court*, *supra*, 139 Cal.App.3d at pp. 1047-1050 [defendants who pleaded right to title both as affirmative defense in unlawful detainer proceeding and as plaintiffs in separate fraud action are entitled to trial of title issue in fraud action].) The record shows that although Moore was willing to litigate the issue of title, he objected to doing so under the summary procedures that apply to unlawful detainer proceedings, without having the opportunity for reasonable discovery of documents and preparation that can be completed "quickly and expeditiously."

It has been held that an adjudication of title in an unlawful detainer proceeding can be affirmed when the defendant has acceded to the summary nature of the trial, and has had a full and fair opportunity to present his evidence bearing on the issue of title. (*Wilson v. Gentile* (1992) 8 Cal.App.4th 759, 761.) That rule does not apply here, however, because the record does not establish either that Moore acceded to the summary procedures, or that he had a full and fair opportunity to present his evidence bearing on

---

[23] The record shows that Martin-Bragg did not intend to physically possess the property other than to rent or sell it. The damages she would suffer from delay of the proceedings therefore were wholly monetary. Moore, on the other hand, had lived and worked in the house for more than a decade, since before his domestic partnership with Martin-Bragg; and the evidence indicated that he might well have had resources available to compensate Martin-Bragg for any monetary loss.

the issue of title. (See *Gonzales v. Gem Properties, Inc.*, *supra*, 37 Cal.App.3d at p. 1036 [unlawful detainer judgment obtained under summary procedures is not res judicata on the question of title obtained by fraud]; *Asuncion v. Superior Court*, *supra*, 108 Cal.App.3d at p. 144 [summary unlawful detainer action is not suitable for trial of complicated ownership issues].)

In *Gonzales v. Gem Properties, Inc.*, *supra*, 37 Cal.App.3d 1029, the court had purported to adjudicate the defendant's claim of title in a summary unlawful detainer proceeding. The unlawful detainer plaintiff then asserted the unlawful detainer judgment as res judicata requiring dismissal of the dispossessed defendant's separate action for title. The court of appeal held that res judicata could not apply, because the record was inadequate to establish that the unlawful detainer defendant had received a full adversary hearing on the issues involved in his subsequent suit claiming fraud in the acquisition of title to the property. (*Id*. at pp. 1033, 1036.) "The summary nature of unlawful detainer proceedings suggests that, as a practical matter, the likelihood of the defendant's being prepared to litigate the factual issues involved in a fraudulent scheme to deprive him of his property, no matter how diligent defendant is, is not great. . . . Investigation and discovery are not always available to a defendant who must face the time element of unlawful detainer proceedings provided in Code of Civil Procedures sections 1167, 1179a." (*Id.* at p. 1036; *Asuncion v. Superior Court*, *supra*, 108 Cal.App.3d at p. 147 [court in which action for title is filed should "retain jurisdiction over the matter so long as substantive issues of ownership remain to be litigated."])

Much like the case of *Gonzales v. Gem Properties, Inc.*, in this case after the court had denied his requests for consolidation, Moore attempted to assert his own title and to refute Martin-Bragg's evidence of her title to the property. But the summary procedures that apply to unlawful detainer precluded him from obtaining the discovery that ordinarily is afforded to litigants in civil actions concerning claims of title, even upon abbreviated and expedited terms. Moore's initial attempt to obtain consolidation of the cases had come just three days after his answer was filed in the unlawful detainer proceeding, but just a week before the June 30, 2011 commencement of the unlawful

28

detainer trial.  It was denied on June 27, 2011, too late as a practical matter to commence any meaningful discovery in the unlawful detainer case.  (Code Civ. Proc., § 2024.040, subd. (b)(1) [discovery in summary proceedings for possession of property to be completed on or before fifth day before date set for trial].)  Moore's requests for even limited discovery concerning the documents that the court identified as critical to the issue of title were denied, admittedly because the court "assumed that you were trying to delay the trial."[24]

The cases cited above are consistent in holding that adjudication of complex issues of title to property should not be forced to adhere to the strictures that apply to summary proceedings for unlawful detainer.  (*Lynch & Freytag v. Cooper*, *supra*, 218 Cal.App.3d at p. 609 ["It would obviously be unfair to require the defendant-tenant to defend against ordinary civil actions under the constraints of the summary procedure in unlawful detainer actions"]; *Asuncion v. Superior Court*, *supra*, 108 Cal.App.3d at p. 147 [court hearing action for title should "retain jurisdiction over the matter so long as substantive issues of ownership remain to be litigated"]; *Berry v. Society of St. Pius X*, *supra*, 69 Cal.App.4th at p. 364, fn. 7 [summary remedy of unlawful detainer action is not proper vehicle for litigation of complex issues of title]; see *Lindsey v. Normet*, *supra*, 405 U.S. at pp. 64-66 [summary unlawful detainer procedures are constitutionally acceptable when applied to straightforward issues of possession and incidental damages].)  The trial court nevertheless ultimately refused to address the issue of title outside of the summary unlawful detainer proceeding.

The factual record on which the trial court based its judgment was undoubtedly sufficient to support its findings; Moore has not contended otherwise in this appeal.  But the record does not establish that Moore received a full adversary hearing on the issues involved in his suit for title to the property.  Nor was he permitted to engage in

---

[24] The record does not reflect the extent to which Moore sought formal discovery before the unlawful detainer action's trial commenced on June 30, 2011.  But the trial commenced just ten days after his answer was filed, and a few days after the court's denial of his motion to relate and consolidate the case with his quiet title action.

29

reasonable discovery to obtain evidence in his defense and to support his claim to ownership of the property at trial. We do not hold that trial courts must in all cases grant applications for consolidation of an unlawful detainer proceeding with a pending quiet title action, no matter how straightforward the issues, and no matter what the circumstances. With or without consolidation of the cases, trial courts have available options to address plaintiffs' legitimate rights and need for protection from unjustified delay of the unlawful detainer proceeding, while still affording reasonable opportunities for discovery and to prepare for trial of complex issues relating to the property's title. The trial court has discretion, for example, to sever and separately try the issue of title to the property, while assuring the availability of fair compensation to the plaintiff for any delay in acquiring possession. (Code Civ. Proc., § 1170.5, subd. (c) [court may order defendant to pay contract rent into court during delay of trial for defendant's benefit].)

There is no certainty that any evidence Moore might have obtained in reasonable discovery would have been sufficient to persuade the trial court to accept Moore's version of the events, or to cast doubt on Martin-Bragg's claims of payment for and ownership of the property. Nor is it certain that notice and reasonable opportunity for preparation would have enabled Moore to effectively address the plaintiff's case. But the record is sufficient to lend support to his claim that the expedited and summary unlawful detainer trial schedule resulted in "trial by ambush." For example, no copy of the purported rental agreement was attached to the unlawful detainer complaint (as the Code requires (Code Civ. Proc. § 1166, subd. (d)(1)); and Moore not only had no notice of Mr. Rile's testimony concerning the validity of his signature on the rental agreement, he was not given a copy of Mr. Rile's written report or its exemplar copies even when the witness testified, nor until sometime during the subsequent lunch break, after he had been compelled to begin his cross-examination of the witness—contrary to the procedures for expert witness discovery in Code of Civil Procedure section 2024.030, and to ordinary rules of fair trial procedure.

Moore's claim that further preparation was needed is also bolstered by the court's recognition that documentary proof that Martin-Bragg had paid, and Mr. Hills had

30

received, substantial consideration for the property's purchase (contrary to the testimony of Moore's witnesses) was critical. The court explained: "the question is, is there something behind the title? Did she acquire the property for consideration, or was it given to her for free, which would suggest that she's holding it in trust . . . ." As far as the record shows, the court had before it no escrow documents signed by the seller, no title report for the property's sale, and no documentary evidence that the seller had received the $48,000 escrow payment.

Moore objected that his lack of preparation, inability to produce certain witnesses, and lack of the critical evidence the trial court had identified was rooted in the summary nature of the unlawful detainer proceeding: "[A]ll the discovery that would have been needed in order to flush these untruths out were not afforded to the defendant. That's why the defendant made the request a long time ago to combine the cases . . . ."[25]

Here, the trial court erred. The law affords substantial procedural rights to litigants in cases involving adjudication of complex issues of legal and beneficial title to property. Moore's enjoyment of those rights was compromised by the trial court's insistence on trying those complex issues using the summary procedures that are approved only for the determination of a landlord's right to possession in straightforward unlawful detainer proceedings. The fact that Moore needed time for discovery and preparation with respect to these (and other) issues resulted directly from the trial court's erroneous determination to adjudicate the issues regarding the parties' rights to beneficial title—complex issues having nothing to do with whether or not rent had been paid—in this unlawful detainer proceeding.

The determination of error is not itself sufficient to justify a reversal of the judgment, of course. (Cal. Const., art. VI § 13 [reversal only where error has resulted in miscarriage of justice]; Code Civ. Proc. § 475 [reversal only where error is prejudicial].)

---

[25] The court had refused Moore's request for an order for the bank to produce a copy of the backside of the $48,000 escrow company check to show that Mr. Hills had received the funds, instead apparently taking the word of Martin-Bragg's counsel that the bank had destroyed the record.

31

While it is easy to doubt that Moore would have been able to change the trial court's negative credibility determinations, even with more discovery and time to prepare, that is not the test. Error in trial proceedings is prejudicial when there is a "reasonable probability" that the error affected the outcome of the trial. (*College Hosp. Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715.) And "reasonable probability" does not mean "more likely than not"; it means merely a "*reasonable chance*, more than an *abstract possibility.*" (*Ibid.*)

In light of the sharply conflicting testimony in this case on key subjects—such as whether Martin-Bragg had or had not agreed to hold the property in trust, and whether Mr. Hills had or had not been paid for the property's transfer to Martin-Bragg—we cannot say that the error in this case was insubstantial, or that there was no more than an abstract possibility that a result more favorable to Moore might have been achieved in the absence of the error. (*Ibid.*) Under the applicable test, the error was prejudicial.

## CONCLUSION

The court had before it allegations demonstrating a complex factual scenario under which the unlawful detainer plaintiff might not hold title sufficient to justify an unlawful detainer judgment in her favor, and that the unlawful detainer defendant and others might well be entitled to quiet title to the property. Faced with these circumstances, the trial court's trial and implicit determination of the ownership issue within the summary unlawful detainer proceeding, and refusal to permit trial of the issue of title outside of those summary procedures, was an abuse of discretion requiring the judgment's reversal and remand to the trial court for determination of the parties' rights to legal and beneficial title to the property, and their respective rights to possession based on that determination. In view of our decision, it is unnecessary for us to consider the appellant's remaining contentions on appeal, or to address the parties' remaining requests for judicial notice.

32

**DISPOSITION**

The judgment is reversed.   The appellant is entitled to his costs on appeal.

                                                        CHANEY, J.

We concur:


        MALLANO, P. J.


        ROTHSCHILD, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| KIMBERLY MARTIN-BRAGG, | B238772 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC459449) |
| v. | |
| IVAN RENE MOORE, | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Defendant and Appellant. | [NO CHANGE IN JUDGMENT] |

THE COURT:*

The opinion filed in the above-entitled matter filed on August 1, 2013, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

There is no change in the judgment.

_____

*     CHANEY, J.        MALLANO, P. J.        ROTHSCHILD, J.