Filed 7/30/18; Modified and Certified for Publication 8/28/18 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| MARTIN J. COYNE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DIEGO DE LEO,<br><br>    Defendant and Appellant. | A149660<br><br>(San Francisco City and County<br>Super. Ct. No. CUD-16-655485) |

In this unlawful detainer action filed under the Ellis Act (Gov. Code, § 7060 et seq.), defendant Diego De Leo appeals from a judgment of possession entered in favor of his landlord, Martin J. Coyne. De Leo argues, inter alia, the trial court committed prejudicial error in its exclusion of evidence. We agree the trial court abused its discretion in excluding the evidence and reverse.

## I.    LEGAL BACKGROUND

The Ellis Act sets forth the procedure by which a landlord may go out of business by removing *all* of his or her rental units in a building from the market. (*Drouet v. Superior Court* (2003) 31 Cal.4th 583, 589–590 (*Drouet*).) "The Ellis Act . . . provides that no statute, ordinance, regulation, or administrative action 'shall . . . compel the owner of any residential real property to offer, or to continue to offer, accommodations in the property for rent or lease.' (Gov. Code, § 7060, subd. (a).) . . . If necessary, the landlord may institute an action for unlawful detainer to evict the tenants and recover possession of the property. (Gov. Code, § 7060.6.)" (*Drouet*, at p. 587.) "The right articulated in the [Ellis] Act, however, is expressly made subject to certain other laws. For example,

1

the Act is not intended to interfere with local authority over land use . . . . *Nor does the Act permit a landlord to withdraw from rent or lease less than all of the accommodations* in a building. ([Gov. Code, § 7060.7], subd. (d).)" (*Drouet*, at p. 590.)

Unlawful detainer actions are authorized and governed by Code of Civil Procedure section 1161 et seq. "The statutory scheme is intended and designed to provide an expeditious remedy for the recovery of possession of real property. [Citation.] Unlawful detainer actions are, accordingly, of limited scope, generally dealing only with the issue of right to possession and not other claims between the parties, even if related to the property." (*Larson v. City and County of San Francisco* (2011) 192 Cal.App.4th 1263, 1297.) "Affirmative defenses may be asserted only to the extent they might defeat the landlord's right to possession." (*Lincoln Place Tenants Assn. v. City of Los Angeles* (2007) 155 Cal.App.4th 425, 452; accord, *Green v. Superior Court* (1974) 10 Cal.3d 616, 633.)

Retaliatory eviction, codified at Civil Code section 1942.5, is one such defense. (*Drouet, supra*, 31 Cal.4th at p. 587.) Civil Code section 1942.5 makes it unlawful for a landlord to engage in specified conduct against a tenant who is not in default on rent, including "bring[ing] an action to recover possession," because of a tenant's lawful and peaceable exercise of any rights under the law (*id.*, subd. (d)) or because of a tenant's complaints regarding habitability (*id.*, subd. (a)). However, a landlord retains the right to bring an action to recover possession "for any lawful cause." (*Id.*, subd. (f).) To recover possession for a good faith, nonretaliatory reason, the landlord must give the tenant notice of such grounds and, if controverted, the landlord must prove the truth of the reason stated. (*Id.*, subd. (g).)[1]

---

[1] Civil Code section 1942.5 was recently amended. At the time relevant herein, the language now appearing in subdivisions (d), (f), and (g) was found in former subdivisions (c), (d), and (e) respectively. (See Stats. 2017, ch. 489, § 6.) Former subdivision (d), provided: "Nothing in this section shall be construed as limiting in any way the exercise by the lessor of his rights under . . . any law pertaining to the hiring of property or his or her right to do any of the acts described in subdivision (a) or (c) for any lawful cause." Former subdivision (e) provided: "Notwithstanding subdivisions (a) to

In *Drouet*, our Supreme Court harmonized the Ellis Act and the retaliatory eviction statute. The landlord and tenants in that case had a long history of conflict. Several months after the tenants requested various repairs, the landlord served notice he was withdrawing his property from the rental market pursuant to the Ellis Act. (*Drouet, supra,* 31 Cal.4th at p. 588.) When the tenants failed to vacate, the landlord filed an unlawful detainer action, to which the tenants raised a retaliatory eviction defense. (*Id.* at pp. 588–589.) The landlord unsuccessfully moved for summary adjudication of that defense. (*Id.* at p. 589.) On writ review, Division One of this appellate district held that, in unlawful detainer proceedings commenced under the Ellis Act, a tenant may not raise an affirmative defense of retaliatory eviction. (*Ibid.*)

The *Drouet* court reversed and remanded, concluding the Ellis Act did not supersede the retaliatory eviction statute. (*Drouet, supra*, 31 Cal.4th at pp. 593, 600.) Giving effect to both statutory sections, the Supreme Court held: "[W]here a landlord has complied with the Ellis Act and has instituted an action for unlawful detainer, and the tenant has asserted the statutory defense of retaliatory eviction, the landlord may overcome the defense by demonstrating a bona fide intent to withdraw the property from the market. If the tenant controverts the landlord's bona fide intent to withdraw the property, the landlord has the burden to establish its truth at the hearing by a preponderance of the evidence. ([Civ. Code, former] § 1942.5, subd. (e).)" (*Drouet*, at pp. 599–600.)

The *Drouet* majority also rejected the tenants' argument that the landlord "should be compelled to prove not merely that he has a bona fide intent to go out of business but also that this bona fide intent was not motivated by the tenant's exercise of rights under subdivisions (a) and (c) of [Civil Code former] section 1942.5." (*Drouet, supra,*

---

(d), inclusive, a lessor may recover possession of a dwelling . . . if the notice of termination . . . states the ground upon which the lessor, in good faith, seeks to recover possession . . . or do any of the other acts described in subdivision (a) or (c). *If the statement is controverted, the lessor shall establish its truth at the trial or other hearing.*" (Italics added.)

31 Cal.4th at p. 596, italics omitted.) Thus, the fact finder should "consider first whether the landlord's intent to withdraw the property is bona fide. If it is, the statutory defense of retaliatory eviction has been overcome. If the landlord's intent is contested, the landlord has the burden to establish its truth. ([Civ. Code, former] § 1942.5, subd. (e).) Only when the landlord has been unable to establish a bona fide intent need the fact finder proceed to determine whether the eviction is for the purpose of retaliating against the tenant under subdivision (a) or (c) of [Civil Code former] section 1942.5." (*Drouet*, at p. 600.)

*Drouet*'s interpretation "give[s] effect to the plain language of [Civil Code section 1942.5], including [former] subdivisions (d) and (e), which permit a landlord to go out of business and evict the tenants—even if the landlord has a retaliatory motive—so long as the landlord *also* has the bona fide intent to go out of business. . . . If, on the other hand, the landlord cannot establish a bona fide intent to go out of business, the tenants may rely on [former] subdivisions (a) and (c) to resist the eviction." (*Drouet, supra*, 31 Cal.4th at p. 597, fn. omitted.)

Bearing these principles in mind, we turn to the facts of this case.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### *The Parties and Lease*

Martin Coyne has owned the real property located at 566–568A Chestnut Street, San Francisco (the Property) since 1996.[2] The Property includes a building with three apartments (upper, middle, and lower units) and a free-standing, three-bedroom cottage.

De Leo, who was 81 years old at the time of trial, had resided in the cottage since August 1989. Pursuant to an oral lease with the Property's previous owners, De Leo paid

---

[2] Because Martin Coyne shares the same last name as his children, Deirdre, Michael, and Cecilia, we will refer to all by first name. Martin owns a contracting company, Coyne Development Company (Coyne Development), which employs Deirdre. During some of the time relevant herein, the Property has been owned by Martin, his children, and trusts benefiting his children, as tenants in common. However, Martin is the sole plaintiff in the unlawful detainer action.

$770 per month in rent. After Martin purchased the Property, De Leo paid $800 per month in rent.

*2012 Efforts to Move De Leo from the Cottage*

The Property was completely occupied by tenants most of 2012. Maria Esclamado, who was also a Coyne Development employee, rented the upper unit for $2,250 per month. De Leo rented the cottage for $800 per month. Karl and Kate Beale rented the middle unit for $2,250 per month. Dan Guenther and his girlfriend rented the lower unit for $1,600 per month.

Martin testified that, sometime in 2012, he decided to move into the cottage. Martin asked De Leo to move to the lower unit in exchange for a reduced rent of $600 per month. Martin could not recall if he communicated, at the time, the reason he wanted De Leo to move.[3] De Leo initially agreed to move. Martin entered into an oral agreement with Guenther and his girlfriend to vacate the lower unit in exchange for $10,000. At the end of October 2012, Guenther and his girlfriend moved out and Martin painted the lower unit.

De Leo then spoke with his son, who expressed concerns about De Leo moving. Neither De Leo's son, nor any other caregiver, would have a place to stay if De Leo moved to the lower unit. Thus, three to four weeks after he initially agreed to move, De Leo called Martin to say he changed his mind. Martin was frustrated and explained to De Leo that he was committed to moving himself and his children into the Property, and the only viable option left would be to invoke the Ellis Act, which would mean evicting De Leo and the other tenants. De Leo refused to vacate the cottage, and Martin hired counsel.

In December 2012, Martin transferred ownership of a portion of the Property to three trusts established for the benefit of his children, with Martin's sister, Margaret, acting as trustee. Martin, Michael, Deirdre, and Margaret acting as trustee of the three

---

[3] According to De Leo, Martin did not state, in 2012, his desire to occupy the cottage.

5

trusts, also executed a tenancy in common agreement. The amended and restated agreement, effective May 2016, assigned exclusive use of each of the four units as follows: the upper unit to Martin and the trust benefiting Cecilia, the cottage to Martin alone, the middle unit to Martin, Michael, and the trust benefiting Michael, and the lower unit to Martin, Deirdre, and the trust benefiting Deirdre.

In approximately February 2013, Esclamado moved from the upper unit to the lower unit. She paid $1,600 per month in rent. Deirdre moved into the upper unit in March 2013.

*Initial Invocation of Ellis Act and First Unlawful Detainer Action*

On July 1, 2013, Martin filed a "Notice of Intent to Withdraw Residential Units from the Rental Market" (NOITW) with the San Francisco Residential Rent Stabilization and Arbitration Board (Rent Board). That filing was superseded on August 8, 2013, with a second NOITW. In the second NOITW, Martin listed himself as the occupant of the upper unit, even though he did not reside in that unit until January or February 2016, over two years later.[4] In August 2013, Deirdre lived in the upper unit, but she was not listed as its occupant on the second NOITW. Her payments to Martin for mortgage and building expenses also were not included on the second NOITW. Esclamado was listed as the lower unit occupant, but no rent was listed because lower and upper units were designated as "owner occupied." The cottage and middle unit were listed as tenant occupied.

On receiving notice of termination of his tenancy, De Leo requested an extension of the withdrawal date, based on his age. Martin notified De Leo that his tenancy would be extended to August 8, 2014. Martin also enclosed an amount equal to 50 percent of the relocation assistance to which De Leo was entitled as a senior. Martin also extended the date of withdrawal for the middle unit—the Beales' unit—to August 8, 2014. Martin did not extend the date of withdrawal for the upper and lower units. Thus, the Rent

---

[4] Martin moved into the lower unit in August 2015. Deirdre vacated the upper unit in December 2015.

Board recorded "Notice[s] of Constraints on Real Property," which provided that the upper and lower units would be withdrawn from the rental market as of December 6, 2013. The cottage and middle unit would be withdrawn as of August 8, 2014. The notices also described constraints on re-renting the units following the withdrawals (Gov. Code, § 7060.2; S.F. Admin. Code, § 37.9A).

After the cottage's withdrawal date expired without De Leo vacating the premises, Martin filed an unlawful detainer action against De Leo. De Leo successfully challenged the complaint on the ground the notice of termination of tenancy was technically defective. Judgment was entered in De Leo's favor.

*Evidence of Continuing Tenancy in Upper Unit*

In the meantime, not long after the second NOITW was filed, Cecelia and a friend, Margaret Owens, joined Deirdre in the upper unit. Owens moved into the upper unit in November 2013, and Cecelia followed in December 2013.

Even though the upper unit had been withdrawn from the rental market as of December 6, 2013, Deirdre collected rent from Owens until approximately February 2015. Owens had an oral month-to-month lease and paid $600 per month, primarily in cash.[5] Although Owens started occupying the apartment in November 2013, Martin told Deirdre that Owens should not pay rent while the first eviction lawsuit was ongoing. Owens's first recorded rent payment was for January 2014. At that time, Martin knew Owens was paying rent to live in the upper unit.

*Second Invocation of Ellis Act and Second Unlawful Detainer Action*

Martin was angry that the first unlawful detainer action was unsuccessful. After the action was dismissed, Martin's and De Leo's counsel discussed whether De Leo would be willing to move into the lower unit. These negotiations were not productive and De Leo did not move from the cottage. Martin testified he would no longer agree to

---

[5] At her deposition, Owens testified she was told to pay in cash. At trial, she said the cash payments made balancing her checking account easier. Martin denied telling Owens or Deirdre that Owens should pay her rent in cash.

De Leo moving into the lower unit because De Leo had publicly protested the attempted eviction. Martin felt De Leo had "dragged [his] name through the mud," and he "didn't want to have to deal with [De Leo] anymore."

In May 2015, Martin, his sister Margaret (as trustee for the three trusts), Esclamado, Deirdre, and Michael filed a third NOITW. The third NOITW listed Deirdre as the upper unit occupant, De Leo as the cottage occupant, Michael as the middle unit occupant, and Esclamado as the lower unit occupant. The only tenant identified on the third NOITW was De Leo. The other units were identified as owner-occupied. De Leo was also served with written notice terminating his tenancy and requiring him to quit the premises and deliver possession within 120 days.

De Leo again claimed an extension of the withdrawal date based on his senior status. Martin did not dispute the extension, and May 8, 2016, was the new date set for the cottage's withdrawal. The Board recorded new Notices of Constraints on Real Property, which provided that the top, middle, and lower units would be withdrawn from the rental market as of September 5, 2015. The cottage would be withdrawn as of May 8, 2016. The notices also described constraints on re-renting the units following the withdrawals (Gov. Code, § 7060.2; S.F. Admin. Code, § 37.9A.)

During the second invocation of the Ellis Act, Martin specifically directed his children that no rent was to be collected. Martin testified that Michael contributed to the mortgage, property taxes, and building expenses. In December 2015, Deirdre vacated the upper unit. Although she continued to claim an ownership interest in the Property, she did not continue to contribute to expenses or discuss moving back into any of the Property's units after she moved out.

Martin testified he moved into the lower unit in August 2015, and then into the upper unit in January or February of 2016. Martin's friend, William Brisbane, also resided with Martin in the upper unit. Brisbane did not pay rent. In April 2016, Vincent Sollini, the son of a friend of Martin's, moved into the lower unit. Sollini paid no rent, considered himself a guest, and would move out if asked.

8

Martin filed the instant lawsuit for unlawful detainer in May 2016, when De Leo failed to vacate the cottage by its withdrawal date. Martin invoked the superior court's unlimited civil jurisdiction, seeking both possession of the cottage and fair market holdover damages. De Leo answered and alleged as affirmative defenses, inter alia, retaliatory eviction, noncompliance with the Ellis Act, and the Property was not intended to be withdrawn from the rental market.

Trial was to a jury. The jury's special verdict found Martin complied "with the necessary [Ellis Act] procedures" and had "a good faith intention to withdraw [the Property] from the residential rental business." The jury was polled in open court. The jurors were unanimous that Martin had complied with the procedural requirements for withdrawal. With respect to Martin's good faith intent to withdraw the Property from the rental market, the vote was 9 to 3 for Martin.

The trial court entered judgment for possession in Martin's favor. De Leo filed a timely notice of appeal. Pursuant to a stipulation, enforcement of the judgment was stayed pending appeal, on the condition that De Leo move into the lower unit and deposit $800 monthly with the superior court. (See Code Civ. Proc., § 1176.) The parties also stipulated the appeal would be heard on an expedited basis and we granted, in part, Martin's unopposed motion for calendar preference. (Cf. *id*., § 1179a.)

### III.  DISCUSSION

De Leo contends the trial court abused its discretion in sustaining Martin's objections to various categories of evidence De Leo offered to support his position on the key factual issue of whether Martin had a bona fide intent to withdraw the Property from the residential rental market. (*Drouet, supra*, 31 Cal.4th at pp. 599–600.) De Leo acknowledges the trial court admitted evidence the upper unit was rented after its December 2013 withdrawal date, as well as evidence of Martin's inaccurate statement he was an occupant of that unit in August 2013. However, De Leo complains the trial court "essentially excluded everything else that would either directly or inferentially establish a lack of a bona fide good faith intent to withdraw" the Property from the rental market. De Leo also contends the trial court erred in its response to a jury inquiry during

9

deliberations. We address only one alleged evidentiary error because it, standing alone, constitutes prejudicial error. We need not address De Leo's additional arguments.

A.      *Appellate Jurisdiction*

Out of an abundance of caution, we briefly address our appellate jurisdiction. California's courts of appeal lack jurisdiction to hear appeals arising from the limited jurisdiction of the unified trial courts. (Code Civ. Proc., § 904.1, subd. (a).) A cause of action for unlawful detainer, alleging less than $ 25,000 damages, is such a limited civil case. (*Id.*, § 86, subd. (a)(4).) Judgments in such matters are appealable to the appellate division of the superior court. (*Id.*, § 904.2.) The courts of appeal have jurisdiction to hear appeals from judgments arising under superior court unlimited civil case jurisdiction, which requires an amount in controversy of $ 25,000 or more, or which requires relief of a type that cannot be granted in a limited civil case. (*Id.*, §§ 85, 88, 904.1, subd. (a).)

When Martin's unlawful detainer complaint was filed, it was classified as an unlimited civil case because he prayed for damages in excess of $25,000. However, the judgment was solely for possession; Martin deferred resolution of the damages issue to a separate lawsuit filed against De Leo. (See *Northrop Corp. v. Chaparral Energy, Inc.* (1985) 168 Cal.App.3d 725, 729 ["recogniz[ing] the propriety of obtaining possession by unlawful detainer and leaving monetary damages to subsequent litigation"].) Although the unlawful detainer issue was the only issue tried, neither party sought reclassification nor did the trial court consider reclassification on its own motion. (See Code Civ. Proc., § 403.040 [reclassification to limited status is not automatic]; *Stern v. Superior Court* (2003) 105 Cal.App.4th 223, 230–231.) Thus, the case remained unlimited and we have appellate jurisdiction. (See *Ytuarte v. Superior Court* (2005) 129 Cal.App.4th 266, 275 ["a court presiding in unlimited civil actions may enter a judgment that falls within the range of a limited civil action and/or that could have been entered in a limited civil court"]; accord, Code Civ. Proc., § 403.040, subd. (e).)

10

B.    *Evidentiary Rulings*

At trial, De Leo sought to introduce evidence that Martin sold Esclamado a sham ownership interest in the Property, thereby allowing Esclamado to remain as a tenant while Martin professed his intent to withdraw the Property from the residential rental market.  Before any testimony was received, Martin moved in limine to exclude, among other things, such sham evidence, as well as all evidence of his behavior during the "previous Ellis Act withdrawal attempt."

In opposing these motions in limine, De Leo made an extensive offer of proof. The documents offered, but not presented to the jury, included documents facially showing Esclamado was deeded a 10 percent interest in the Property in April 2013.  The deed was recorded a few months after Esclamado moved into the lower unit, where she had been paying $1,600 per month in rent, and a few months before the first NOITW was filed.  Under the terms of the purchase agreement, which was signed in February 2013, Martin sold Esclamado a 10 percent interest in the Property for $500,000, and Esclamado obtained the exclusive right to occupy the lower unit.  However, the terms of the sale were unusual.  Esclamado did not make any down payment, and her purchase was 100 percent seller-financed by Martin.  Esclamado signed a deed of trust and a promissory note in Martin's favor, pursuant to which she was to make monthly payments of interest only, in the amount of $1,583.33.  The loan had a five-year term and required a balloon payment at the end.  Martin paid all closing costs, including title insurance, except for a $20 notary fee paid by Esclamado.  In April 2013, the tenancy in common agreement was amended to reflect Esclamado's ownership and exclusive right to possess the lower unit.

De Leo also offered to prove that Martin believed Esclamado's ownership was temporary and was initiated, at Martin's suggestion, after he decided to invoke the Ellis Act.  When Esclamado stopped making monthly loan payments, vacated the premises, and moved to North Carolina in June or July 2015, De Leo offered to prove she did not seek to sell her interest.  Instead, Esclamado notified Martin she was vacating, and Martin admitted taking possession of the lower unit in August 2015, well before Esclamado

11

signed a deed granting her interest back to Martin.  The grant deed was recorded on December 8, 2015.

The trial court denied Martin's motion to exclude evidence of his behavior during the previous Ellis Act withdrawal attempt, explaining, "a broad range of evidence may reflect on the issue of [Martin's] intent . . . when he announced his intention to withdraw from the rental business, and the court will not foreclose that examination . . . ." However, it granted Martin's fifth motion in limine, wholly excluding "evidence or argument concerning [Esclamado], her relationship to [Martin], [and] her position as an occupier of the property at the premises or as owner."  In granting Martin's latter motion in limine, the trial court concluded any evidence to show the transfer to Esclamado was pretextual or a sham "would lead into a potentially wide reaching inquiry concerning the manner in which title was acquired" and "would introduce matters extraneous [and] would frustrate the summary nature of this unlawful detainer proceeding."  The trial court further explained:  "The *relevance is slight*, and any probative value is far outweighed by the probability of undue confusion and prejudice."  (Italics added.)

*Exclusion of Evidence Regarding Martin's Sale to Esclamado*

De Leo contends the trial court abused its discretion in excluding evidence regarding the 2013 sale to Esclamado.  He asserts the probative value of this evidence was not slight, but was highly probative of Martin's intent.[6]

Only relevant evidence is admissible.  (Evid. Code, § 350.)  Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (*Id.*, § 210.)  The trial court is permitted to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (*Id.*,

---

[6] We need not address De Leo's alternative argument that the evidence was also relevant to whether Martin complied with the procedural requirements of the Ellis Act (Gov. Code, §§ 7060.4, subd. (a), 7060.6).

12

§ 352.)  "Evidence which has probative value must be excluded under section 352 only if it is 'undu[ly]' prejudicial despite its legitimate probative value."  (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 597.)

We review a trial court's order to exclude evidence under Evidence Code section 352 for abuse of discretion.  (*People v. Williams* (1997) 16 Cal.4th 153, 213.)  An abuse of discretion occurs if, in light of the applicable law and considering all of the relevant circumstances, the court's decision exceeds the bounds of reason.  (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478–479.)  "[A] trial court abuses its discretion when it applies the wrong legal standards.  [Citation.]  We decide questions of law de novo." (*People ex rel. Harris v. Shine* (2017) 16 Cal.App.5th 524, 534.)

De Leo argues the purchase contract, note, and deed of trust were sham agreements that did not, in substance, alter the tenant-landlord relationship between Esclamado and Martin.  He contends the Esclamado evidence was thus highly probative of Martin's intent in 2015 to exit the residential rental market.  Martin, on the other hand, contends the evidence was properly excluded for a variety of unpersuasive reasons.

In his first justification for the ruling, Martin argues the trial court "expressly stated" there was no evidence of continuing tenancies, other than De Leo's, during the 2015 Ellis Act withdrawal effort.  As a factual matter, the trial court did not "expressly state" there was no evidence *Esclamado* was a tenant during the second invocation of the Ellis Act.  The remark Martin relies on came during a discussion of jury instructions, well after the Esclamado motion in limine had been resolved and all such evidence excluded. Considered in context, the trial court was stating none of the evidence *admitted* at trial suggested tenancies (other than De Leo's) existed during the second invocation of the Ellis Act.  In other words, there was no evidence Sollini or Brisbane were tenants.

Next, Martin attempts to convince us that Esclamado's status as an owner or a tenant is wholly irrelevant due to timing.  According to Martin, it does not matter if Esclamado remained, in substance, a tenant after April 2013, because she vacated the Property in June 2015, which was *after* Martin filed his third NOITW, but *before* the date Esclamado's unit (the lower unit) was to be withdrawn from the rental market.  Martin

13

suggests we must narrowly focus on either his intent with respect to De Leo's unit *alone* or on his intent with respect to the entire Property *only* on the second Ellis Act withdrawal dates. He contends any broader focus on his intent will unduly burden a landlord's right to exit the residential rental market. Martin's argument would be better presented to the Legislature. The statute itself makes clear Martin may invoke the Ellis Act only to exit the residential rental market altogether, not to remove a mere subset of units at the Property. (Gov. Code, § 7060.7, subd. (d).) *Drouet* also demonstrates Martin is entitled to possession of the cottage only if he can prove, by a preponderance of the evidence, he had a bona fide intent to withdraw the Property in its entirety. (See *Drouet, supra*, 31 Cal.4th at pp. 590, 597–600.) The entire time period is relevant. It would certainly tend to suggest Martin did not have a good faith intent to exit the residential rental market if De Leo could show that, at the time Martin filed the third NOITW, another tenancy continued at the Property—one that Martin not only did not seek to end but also actively sought to obscure.

Furthermore, the trial court explicitly rejected Martin's argument that only his actions during the second invocation were relevant in its ruling on another of Martin's motions in limine. To the extent the trial court contradicted itself and later viewed Martin's intent in 2013 as a completely separate issue from Martin's intent in 2015, the trial court acted arbitrarily and capriciously. *Drouet* emphasized the landlord's re-renting of the premises after a prior Ellis Act eviction is "persuasive evidence" in a subsequent effort to withdraw units from the residential rental market. (*Drouet, supra*, 31 Cal.4th at p. 598 ["an Ellis Act eviction followed closely in time by a re-renting of the premises to new tenants would be persuasive evidence of the landlord's bad faith in any future Ellis Act proceeding. (Civ. Code, [former] § 1942.5, subd. (e); Evid. Code, § 1101, subd. (b).)"].) Martin does not demonstrate why we should not apply similar reasoning in a case where the landlord did not succeed in evicting all tenants during the previous withdrawal effort.

Finally, Martin asserts broadly there is "no authority for the proposition that [De Leo] can defend termination of *his* tenancy on a perceived failure to terminate

14

*another*'s alleged tenancy," particularly when San Francisco maintains ordinances that impose penalties for post-Ellis Act re-rentals. He is correct that both the Ellis Act and municipal ordinances impose penalties on landlords who re-rent withdrawn units in violation of the Ellis Act. (Gov. Code, § 7060.2; S.F. Admin. Code, § 37.9A.) "In order to prevent abuses by landlords who would falsely remove rent-controlled units from the market and then attempt to return them to the rental market at current market rates, the Ellis Act uses a three-tiered timeline, during which a landlord who returns previously withdrawn units to the market suffers a penalty for doing so. ([Gov. Code,] § 7060.2.) Thus, if the landlord offers the previously withdrawn rental units for rent within two years of their withdrawal, the landlord must offer the unit for rent or lease to the displaced tenant at the previous rental plus any intervening annual adjustments, the landlord is liable to the displaced tenant for actual and exemplary damages, and the landlord may be liable to the local public entity for exemplary damages. ([*Id*.,] § 7060.2, subd. (b).) [¶] If the landlord offers the previously withdrawn rental units for rent within five years of their withdrawal, the landlord must offer the unit for rent or lease to the displaced tenant at the previous rental plus intervening annual adjustments, and the landlord is liable to the displaced tenant for punitive damages (not to exceed six months' rent) for failure to offer the rental to the displaced tenant. ([*Id*.,] § 7060.2, subds. (a)(1)–(2)(B), (c).) [¶] If the landlord offers the previously withdrawn rental units for rent within 10 years of their withdrawal, the landlord must offer the unit for rent or lease to the displaced tenant, and the landlord is liable to the displaced tenant for punitive damages (not to exceed six months' rent) for failure to offer the rental to the displaced tenant. ([*Id*.,] § 7060.2, subd. (c).)" (*City of West Hollywood v. Kihagi* (2017) 16 Cal.App.5th 739, 744, fn. omitted.)

*Drouet* made clear that evidence controverting the landlord's stated intent was highly relevant. In rejecting the tenants' concern that "the retaliatory eviction defense is 'the only method available to protect one's home from an alleged phony Ellis [Act] eviction,' " the *Drouet* majority disagreed. (*Drouet, supra*, 31 Cal.4th at p. 597.) It explained, "[A] tenant who believes the landlord's invocation of the Ellis Act . . . is

phony and that the landlord actually intends to offer the vacated units to new tenants *may controvert the landlord's statement of intent*. The landlord will then have the burden to establish his or her bona fide intent to withdraw the property from the market by a preponderance of the evidence. It is that requirement, and not the retaliatory eviction defense itself, that will prevent or deter phony evictions." (*Drouet*, at p. 597, italics added & omitted.) The tenants' fear, "that a landlord may invoke the Act but *secretly* intend to re-rent the units once the existing tenants have been displaced . . . presupposes that although the tenant controverted the landlord's intent, the landlord committed perjury at the hearing, the tenant was unable to uncover the perjury *by cross-examination or by other evidence*, and the fact finder was unable to detect the perjury. *The likelihood of an erroneous outcome is further diminished by the landlord's awareness that an Ellis Act eviction followed closely in time by a re-renting of the premises to new tenants would be persuasive evidence of the landlord's bad faith in any future Ellis Act proceeding*. (Civ. Code, [former] § 1942.5, subd. (e); Evid. Code, § 1101, subd. (b).)" (*Drouet*, at p. 598, italics added.) Finally, the *Drouet* majority noted that "perjury concerns do not arise in *this* case" because "San Francisco has eliminated the incentive for sham Ellis Act evictions by adopting ordinances strictly limiting the landlord's right to re-rent the withdrawn property to others, to raise the rent, or to sell the property unencumbered by these limitations. (S.F. Admin. Code, § 37.9A, subds. (a), (c), (d), (g); see Gov. Code, §§ 7060.2, 7060.3.)" (*Drouet*, at p. 598.) Martin reads *Drouet* selectively to support his argument, asserting *Drouet* suggests there is *no incentive* for a San Francisco landlord to use the Ellis Act as pretext, all the while harboring a secret intent to re-rent withdrawn units. Yet, we cannot agree the existence of these penalties means circumstantial evidence of a landlord's intent should be wholly excluded in an Ellis Act unlawful detainer action where the tenant raises a retaliatory eviction defense.

Martin overlooks the clear teaching of *Drouet*: "[A] tenant who believes the landlord's invocation of the Ellis Act . . . is phony and that the landlord actually intends to offer the vacated units to new tenants may controvert the landlord's statement of intent." (*Drouet, supra*, 31 Cal.4th at p. 597.) The *Drouet* court clearly anticipated that a

tenant could cross-examine and present other evidence to controvert the landlord's stated intent. (*Id.* at p. 598.) We read *Drouet* to state that perjury concerns were lessened by San Francisco ordinances providing other disincentives for re-renting withdrawn properties. (*Ibid*.) But we cannot read *Drouet* as Martin suggests because this reasoning came only after *Drouet* emphasized the landlord's re-renting of the premises after a prior Ellis Act withdrawal is "persuasive evidence" in a subsequent effort to withdraw units from the residential rental market. (*Ibid*.) To the extent the trial court was persuaded by Martin's interpretation of *Drouet*, it erred.

It also appears the trial court mistakenly assumed title issues, of any kind, were entirely off limits in an unlawful detainer case. "In unlawful detainer proceedings, ordinarily the only triable issue is the right to possession of the disputed premises, along with incidental damages resulting from the unlawful detention. (*Larson v. City and County of San Francisco*[, *supra*,] 192 Cal.App.4th [at p.] 1297; [citation].) Ordinarily, issues respecting the title to the property cannot be adjudicated in an unlawful detainer action. [Citations.] The denial of certain procedural rights enjoyed by litigants in ordinary actions is deemed necessary in order to prevent frustration of the summary proceedings by the introduction of delays and extraneous issues." (*Martin-Bragg v. Moore* (2013) 219 Cal.App.4th 367, 385 (*Martin-Bragg*).) But the general prohibition arose in a different context—where a tenant seeks to litigate his or her *landlord*'s title despite the issue being irrelevant to the tenant's entitlement to possession. "The purpose of the unlawful detainer statutes is to provide the landlord with a summary, expeditious way of getting back his property when a tenant fails to pay the rent or refuses to vacate the premises at the end of his tenancy. If a defendant were allowed to assert affirmative defenses or cross-claims *which were irrelevant to the right of immediate possession*, the summary character of the proceedings would be lost. A defense which 'arises out of the subject matter' of the original suit, and, thus, is permitted in the usual case, is normally excluded in an unlawful detainer if the defense is extrinsic to the issue of possession, (*Knowles v. Robinson* [(1963)] 60 Cal.2d 620, 625). This does not mean the defendant may not present any defense; rather, he may only assert those defenses which, if proven,

17

would either preserve his possession as a tenant or preclude the landlord from recovering possession." (*Nork v. Pacific Coast Medical Enterprises, Inc.* (1977) 73 Cal.App.3d 410, 413, italics added.)

In the usual unlawful detainer case, the tenant is estopped from challenging his or her landlord's title because (1) the tenant previously agreed to pay the landlord rent; and (2) if some third party has title to the property, the tenant nonetheless has no right to possession. (*Reay v. Cotter* (1865) 29 Cal. 168, 170–171.) In such a case, the tenant may not question his landlord's title to the property because regardless of "[w]hether the tenant won or lost his claim that the landlord's title was defective, it would not affect [the tenant's] right to possession of the property." (*Nork v. Pacific Coast Medical Enterprises, Inc., supra,* 73 Cal.App.3d at p. 415.) California law does not prohibit an unlawful detainer defendant from interposing a defense involving title issues, so long as the defense, if established, would result in the tenant retaining possession of the premises. (*Adler v. Elphick* (1986) 184 Cal.App.3d 642, 645–646.)

De Leo contends he was not challenging his *landlord*'s title because he did not dispute Martin's title; he was challenging only *Esclamado's* title. However, even if the landlord's title is deemed at issue, Martin and the trial court misplaced their reliance on the general rule laid out in *Martin-Bragg* for another reason—it is not an Ellis Act case.[7]

---

[7] If anything, *Martin-Bragg* supports De Leo's position. In *Martin-Bragg*, the unlawful detainer defendant disputed the plaintiff's title to the property, and claimed he owned the property instead. (*Martin-Bragg, supra*, 219 Cal.App.4th at p. 392.) These disputes involved " 'complex and complicated property ownership issues' " which could entitle the defendant to quiet title. (*Id.* at pp. 385; see *id.* at p. 395.) The reviewing court held the court abused its discretion by refusing relief from the summary procedures (and limited discovery) that apply to limited unlawful detainer proceedings, rather than granting the defendant's motion to consolidate the matter with a pending quiet title action. (*Id.* at pp. 384–395.) "[W]hen complex issues of title are involved, the parties' constitutional rights to due process in the litigation of those issues cannot be subordinated to the summary procedures of unlawful detainer. [Citation.] By failing to determine whether and how [the unlawful detainer defendant's] rights and needs might be balanced with [the plaintiff's] legitimate interests in the matter's prompt resolution, and instead proceeding to try the complex issue of the parties' rights to title of the property within the

In fact, Martin does not point us to any authority, and we are not independently aware of any, in which the prohibition on trying title issues was applied in an Ellis Act unlawful detainer case.

Here, in contrast to the more traditional unlawful detainer cases, it is undisputed the key issue relevant to possession was Martin's *intent*. (*Drouet, supra*, 31 Cal.4th at pp. 599–600; Civ. Code, § 1942.5, subd. (g).) And, as previously stated, the disputed evidence regarding Esclamado's title was relevant to Martin's intent. In our view, there is ample reason not to apply a blanket prohibition on trying title issues in a case of this nature. Otherwise, it would be all too easy for an unscrupulous landlord to evade the Ellis Act's requirement that the landlord intend to remove all units from the residential rental market. (*Drouet*, at p. 590; Gov. Code, § 7060.7, subd. (d).)

We have been presented with no compelling reason which would justify precluding full and fair consideration of the key issue underlying possession in this matter (Martin's intent), especially when Martin filed his unlawful detainer action in unlimited civil jurisdiction. (See *Ytuarte v. Superior Court, supra*, 129 Cal.App.4th at p. 275 ["a court in a *limited* civil action cannot determine the title to real property" (italics added)].) " 'Certainly the interest in preserving the summary nature of an action cannot outweigh the interest of doing substantial justice. To hold the preservation of the summary proceeding of paramount importance would be analogous to the "tail wagging the dog." ' " (*Green v. Superior Court, supra,* 10 Cal.3d at p. 636 [considering whether summary nature of unlawful detainer should foreclose tenant from raising breach of habitability defense].) The trial court abused its discretion to the extent it relied on the summary nature of unlawful detainer actions to exclude evidence highly probative on the

confines of the summary procedures that apply only to straightforward determination rights to possession, the court abused its discretion." (*Id.* at p. 391, fn. omitted.) Here, unlike in *Martin-Bragg*, we are aware of no alternate proceeding in which to resolve the title issues presented by De Leo. And De Leo did not object to litigating the issue in the summary unlawful detainer proceeding. *Martin-Bragg* certainly does not suggest that a disputed title issue relevant to possession should be passed altogether.

19

key possession issue.  "[W]hile the state does have a significant interest in preserving a speedy repossession remedy, that interest cannot justify the exclusion of matters which are essential to a just resolution of the question of possession . . . ."  (*Ibid.*)

Finally, Martin contends De Leo's proffered evidence was irrelevant because it cannot, as a matter of law, support the conclusion he and Esclamado continued to have a landlord-tenant relationship.  In particular, Martin points to the grant deed as uncontroverted evidence of Esclamado's status as an owner, not a tenant.

Evidence Code section 662 provides:  "The owner of the legal title to property is presumed to be the owner of the full beneficial title.  *This presumption may be rebutted* only by clear and convincing proof."  (Italics added.)  This section applies "when there is no dispute as to where legal title resides but there is question as to where all or part of the beneficial title should rest."  (*Murray v. Murray* (1994) 26 Cal.App.4th 1062, 1067, italics omitted.)  De Leo made an offer of proof that suggests the transaction was a sham and beneficial title never passed to Esclamado.

De Leo's offer of proof showed that the sale's terms suggested the transaction was being used as a pretext to allow Esclamado to remain in possession of the lower unit without obtaining any fee simple interest in the Property.  Esclamado purportedly agreed to purchase a 10 percent interest in the Property for $500,000, which does not appear to have any relationship to the valuation of the Property.  Esclamado paid no down payment and the entire purchase price was secured by a purchase money deed of trust in Martin's favor, which imposed no personal liability on her.  (*Stone v. Lobsien* (1952) 112 Cal.App.2d 750, 756.)  During the time Esclamado occupied the lower unit as a purported owner, she paid only interest on the loan—in an amount approximating the $1,600 she previously paid in monthly rent.  Martin had a right of first refusal if Esclamado sought to sell her interest.  De Leo offered to prove that when Esclamado stopped making payments on the note and moved to North Carolina, she did not seek to sell her interest.  She simply stopped making payments, abandoned the premises, and Martin recovered

20

possession without the necessity of foreclosure on the deed of trust.[8] Martin himself testified at deposition that the only reason Esclamado purchased an interest in the Property was because he could not collect rent from her while invoking the Ellis Act.

A reasonable conclusion could be drawn that, despite the form of the transaction, Esclamado remained, in substance, a tenant—having obtained, in effect, only a present possessory interest in the lower unit, while Martin retained his future, reversionary interest. (See *Avalon Pacific—Santa Ana, L.P. v. HD Supply Repair & Remodel, LLC* (2011) 192 Cal.App.4th 1183, 1190 ["[a] leasehold estate gives the lessee the exclusive possession of the premises against all the world . . . for the term of the lease," but "the lessor has a future reversionary interest and retains fee title"].)

The trial court's and Martin's reliance on *Santa Monica Rent Control Bd. v. Bluvshtein* (1991) 230 Cal.App.3d 308 (*Bluvshtein*) does not persuade us to reach a contrary conclusion. In that case, the defendants purchased a multi-unit residential property as tenants in common or joint tenants, invoked the Ellis Act to evict the existing tenants in eight of the building's 10 units, and occupied the units themselves. They formed a general partnership and orally agreed each had a terminable right of exclusive possession to specified units, for renewable terms of a year, and agreed on a method for making mortgage payments and collecting maintenance fees. (*Id*. at pp. 312, 315.) The Santa Monica Rent Control Board sued the tenant in common owners for damages for violation of the Ellis Act. (*Id.* at pp. 311–312.) The Santa Monica Rent Control Board

---

[8] The parol evidence rule generally prohibits the consideration of extrinsic evidence to vary or contradict the terms of an integrated written instrument. (Code Civ. Proc., § 1856; Civ. Code, § 1625; *Casa Herrera, Inc. v. Beydoun* (2004) 32 Cal.4th 336, 343.) However, the rule does not prohibit consideration of extrinsic evidence to explain the meaning of a writing if the writing is reasonably susceptible to the meaning shown. (*Casa Herrera*, at p. 343.) The parole evidence rule also does not prohibit the consideration of extrinsic evidence offered to show that a writing is a sham. (*P. A. Smith Co. v. Muller* (1927) 201 Cal. 219, 222; *FPI Development, Inc. v. Nakashima* (1991) 231 Cal.App.3d 367, 401; *Parker v. Meneley* (1951) 106 Cal.App.2d 391, 401.) "Such evidence does not change a written contract by parol, but serves to establish that such contract had no force, efficacy, or effect." (*P. A. Smith Co.*, at p. 222.)

21

alleged the oral agreement created a landlord-tenant relationship between the owners, which constituted reentry into the rental housing market and triggered causes of action for exemplary damages and injunctive relief. (*Id.* at pp. 312, 313, 315.)

The Second District Court of Appeal affirmed the trial court's judgment of dismissal, reasoning that "the oral agreement did not establish a landlord-tenant relationship" as a matter of law. (*Bluvshtein, supra,* 230 Cal.App.3d at p. 316.) "Whether the oral agreement is a lease is a question of law arising out of the construction of the agreement. [Citation.] The oral agreement here is not a lease as it neither evidences an intent to create a landlord-tenant relationship nor provides for the payment of rent. [¶] Provisions for the payment of rent and a transfer of use and possession of property are essential elements of a lease." (*Ibid*.) Because the oral agreement did not specify the amount or manner of payment of rent, and the payments were to be for the mortgage and maintenance of the property and not for its use and possession, *Bluvshtein* concluded "they were not payments for rent." (*Id.* at p. 317.)[9] The oral agreement was not a lease, "but rather was a purchase agreement setting up a method for making mortgage payments and collecting maintenance fees from the owners of the units." (*Ibid*.) *Bluvshtein* also observed that the oral agreement did not " 'show an intention on the part of one party to dispossess himself of the property and of the other to enter and hold in subordination to the title of the first party,' " which were deemed hallmarks of a lease. (*Id.* at pp. 316–317.) "Although appellant alleges that respondents purchased the property as tenants in common and gave up possession of units other than their own, such an action is not the normal dispossession of property by one party and possession by a second party in subordination to the title of the first party." (*Id.* at p. 317.)

---

[9] More interesting for our analysis was the court's observation that rent is defined, "[f]or income tax deduction purposes . . . as 'payments required to be made as a condition to the continued use or possession . . . of property to which the taxpayer has not taken or is not taking title *or in which he has no equity*.' (26 U.S.C. § 162(a)(3).)" (*Bluvshtein, supra*, 230 Cal.App.3d at p. 317, italics added.)

22

*Bluvshtein* is distinguishable because the intent of the oral agreement at issue was clear. Furthermore, no extrinsic evidence suggested the *Bluvshtein* agreement was a sham. In particular, none of the owners were prior tenants of any other owner at the same building before the Ellis Act was invoked. No subset of the owners paid zero consideration for their ownership interests and merely paid interest to another owner in an amount that approximated their prior rent.

We agree with De Leo the trial court abused its discretion in finding the Esclamado evidence more prejudicial than probative. Given the highly probative nature of this evidence on the key issue in the case, the prejudice flowing therefrom would have to be very high to justify its exclusion under Evidence Code section 352. Here, the trial court explicitly stated its apparent misunderstanding that the Esclamado evidence would introduce "extraneous issues" and that the "relevance is slight." Neither the trial court nor Martin identified what is unduly prejudicial or confusing about the evidence.

To be sure, the evidence may very well have damaged Martin's case, but Evidence Code section 352's reference to "prejudice" does not mean "damaging" to a party's case. It means evoking an emotional response having very little to do with the issue on which the evidence is offered. (*People v. Karis* (1988) 46 Cal.3d 612, 638; *Rufo v. Simpson, supra,* 86 Cal.App.4th at p. 597.) Even if the Esclamado evidence could only be characterized as prior bad acts evidence admissible to show intent (see *Drouet, supra*, 31 Cal.4th at p. 598; Evid. Code, § 1101, subd. (b)), the potential for undue prejudice remained minimal. The transaction with Esclamado was not remote in time; the transaction took place two years before the third NOITW was filed and shortly before the filing of the first and second NOITW's. Esclamado still occupied the lower unit at the time the third NOITW was filed. We do not mean to suggest that a landlord's actions in a prior Ellis Act withdrawal will *always* be admissible in an unlawful detainer action involving a subsequent invocation, no matter how much time has intervened. In the circumstances of this case, the trier of fact should have had the opportunity to consider

whether Esclamado's purchase was a sham and did not, in substance, change her status as a tenant.[10] The trial court's evidentiary ruling completely foreclosed the inquiry.

Given the conflicting evidence on the key issue—whether Martin had a bona fide intent to exit the residential rental market—and the fact that the jury was not unanimous in its resolution of the issue even when De Leo's case was presented in a limited fashion, we cannot say no more than an abstract possibility existed that a result more favorable to De Leo might have been achieved in the absence of the error.[11] (See *College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715 [error in trial proceedings is prejudicial when there is a " 'reasonable probability' " the error affected the trial outcome].) Because the trial court erroneously foreclosed presentation of De Leo's proffered evidence, which went to the heart of Martin's right to possession of the cottage, the judgment in Martin's favor must be reversed. We need not address De Leo's remaining arguments.

## IV.    DISPOSITION

The judgment is reversed and the matter is remanded. De Leo is to recover his costs on appeal.

---

[10] The jury was instructed on the legal requirements for creation of a landlord-tenant relationship: "An owner who invokes the Ellis Act only violates the Act if the owner enters into a landlord-tenant relationship after the effective date of withdrawal. The landlord-tenant relationship is created by a contract between the parties. This contract, known by a variety of names, may be oral or written and express or implied. The contract must show (expressly or from the facts) that the parties intend to create a landlord-tenant relationship and must contain the following: a designation of the parties, a description of the premises, the rent to be paid, the time and manner of payment, and the term for which the tenant will rent the property. Provisions for the payment of rent and a transfer of use and possession of property are essential elements of a lease. Rent is the consideration paid by the tenant for the use, possession and enjoyment of the demised premises. The lease or rental agreement should clearly specify the amount and manner of rent payment." Because De Leo has not urged any error in connection with this instruction, we do not address whether it provided a correct statement of the law.

[11] During its deliberations, the jury also sent a note to the trial judge, which demonstrated the jury's focus on the intent issue.

                                            _____
                                            BRUINIERS, J.


WE CONCUR:


_____
SIMONS, Acting P. J.


_____
NEEDHAM, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| MARTIN J. COYNE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>DIEGO DE LEO,<br><br>　　　　Defendant and Appellant. | A149660<br><br>(San Francisco City and County<br>Super. Ct. No. CUD-16-655485)<br><br>**ORDER MODIFYING AND**<br>**PUBLISHING OPINION;**<br>**DENYING REHEARING**<br>**[NO CHANGE IN JUDGMENT]** |

**THE COURT:**

Respondent's petition for rehearing is DENIED. This court's July 30, 2018 opinion meets the standard for publication set forth in rule 8.1105(c) of the California Rules of Court. Accordingly, the requests for publication are GRANTED. It is further ordered that the opinion filed on July 30, 2018, shall be MODIFIED as follows:

1.　　On page 16, in the final sentence of the first partial paragraph on the page, the phrase "where the tenant raises a retaliatory eviction defense" shall be deleted.

2.　　On page 20, between the second complete paragraph and the final, partial paragraph on the page, add the following new paragraph:

　　　　We question whether Evidence Code section 662 would necessarily apply in these circumstances. "Section 662 codifies the common law rule [citations] that oral trusts in derogation of title are disfavored . . . ." (*People v. Semaan* (2007) 42 Cal.4th 79, 88.) "Evidence Code section 662 does not apply, however, when title itself is challenged as not genuine." (*Ibid.*) In any event, the relevant focus here is not the operative effect of the disputed Esclamado deed, but Martin's state of mind and his intent for purposes of the Ellis Act.

3.　　On page 23, following the first complete paragraph on the page, new second and third paragraphs are added. Those new paragraphs shall read:

Contrary to Martin's suggestion, contract construction does not always present a question of law. "Interpretation of a written instrument becomes solely a judicial function only when it is based on the words of the instrument alone, *when there is no conflict in the extrinsic evidence*, or when a determination was made based on incompetent evidence. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865; [citation].) But when . . . ascertaining the intent of the parties at the time the contract was executed depends on the credibility of extrinsic evidence, that credibility determination and the interpretation of the contract are questions of fact that may properly be resolved by the jury (*Warner Constr. Corp. v. City of Los Angeles* (1970) 2 Cal.3d 285, 289 ['since the interpretation of the crucial provisions turned on the credibility of expert testimony, the court did not err in submitting the construction of the contract to the jury'])." (*City of Hope National Medical Center v. Genentech, Inc*. (2008) 43 Cal.4th 375, 395, italics added & fn. omitted.)

In contrast to *Bluvshtein*, the record here shows significant extrinsic evidence in addition to the deed and written agreements. (See *Cedars-Sinai Medical Center v. Shewry* (2006) 137 Cal.App.4th 964, 980 ["[e]xtrinsic evidence can include the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties"].) There is Martin's deposition testimony (from which multiple inferences could reasonably be taken), evidence of Martin's and Esclamado's relationship before the agreements were signed, as well as evidence regarding their conduct after the agreements were signed. Because this extrinsic evidence presents conflicting inferences and because a credibility determination will need to be made regarding Martin's testimony, construction of the agreements is not a question of law.

4.     On page 23, a new footnote is added at the conclusion of the last complete sentence on the page which reads, "We do not mean to suggest that a landlord's actions in a prior Ellis Act withdrawal will *always* be admissible in an unlawful detainer action involving a subsequent invocation, no matter how much time has intervened." The new footnote shall read:

Nor are we suggesting the trier of fact in all Ellis Act unlawful detainer cases should make similar inquiries whenever a former tenant acquires an ownership interest. Our holding is limited to the unique circumstances presented in this case.

The modification effects no change in the judgment.

Date:_____     _____ Acting P.J.

2

Superior Court of the City and County of San Francisco, No. CUD-16-655485, Leslie C. Nichols, Judge.

Tenderloin Housing Clinic and Stephen L. Collier for Defendant and Appellant.

Zacks, Freedman & Patterson, Andrew M. Zacks and Emily L. Brough for Plaintiff and Respondent.